HALL-OMAR BAKING COMPANY *vs.* COMMISSIONER OF
LABOR AND INDUSTRIES.

Suffolk.     May 9, 1962. — July 5, 1962.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER,
& SPIEGEL, JJ.

*Hawkers and Pedlers.    Bakery.    Constitutional Law,* Equal protection of
laws, Hawkers and pedlers, Bakery, Separable portions of statute.

Statement of certain general principles applicable in determining the
constitutionality of a statute.  [700–701]
On the facts respecting a bakery company whose many driver-salesmen
sold its products to householders from trucks operated on sundry routes,
and respecting selling in a similar manner of dairy products and eggs
by other companies competing with the bakery company in "a common
labor market" for qualified driver-salesmen, application to the bakery
company and its driver-salesmen of the hawkers and pedlers provisions
of G. L. c. 101 requiring, among other things, a license at a substantial
fee for each of such employees, whereas by § 15, as amended, a com-
pany selling dairy products and eggs was exempt from such provisions
if it held a single license at a nominal fee for all its driver-salesmen
under c. 94, § 40, was discriminatory and unconstitutional.  [707–708,
709]
A decision that application of the hawkers and pedlers provisions of G. L.
c. 101 to a bakery company was discriminatory and unconstitutional in
view of the exemption from such provisions afforded to companies sell-
ing dairy products and eggs by the amendments of § 15 by St. 1937,
c. 214, and St. 1955, c. 757, § 11, was not precluded on the ground
of severability of such exemption.  [708]

BILL IN EQUITY filed in the Superior Court on August 14,
1961.

The suit was reported by *Tauro, J.*

*Franklin T. Hammond, Jr.* (*Joseph P. Rooney* with him)
for the plaintiff.

*Lawrence E. Cooke,* Assistant Attorney General (*Ray-
mond F. O'Connell* with him), for the defendant.

WHITTEMORE, J.    The plaintiff (Hall-Omar), a maker
and retailer of bakery products, seeks a declaration under
G. L. c. 231A that its drivers and supervisors are not
"hawkers" or "pedlers" under G. L. c. 101, and that c. 101,

if applicable, is discriminatory and unconstitutional as applied to it and to its employees, particularly in view of the exemption of milk companies in their household deliveries of dairy products.[1] The cause was reserved in the Superior Court and reported without decision on the pleadings and an agreement as to all the material facts.

Hall-Omar, a Delaware corporation, owns and operates bakeries in Massachusetts and other States and makes and sells bakery products. It has a bakery in Somerville and operates in Dedham a distribution depot and sales office. It has approximately 185 trucks owned or leased by it. It employs in the operation of the trucks and the sale and delivery of bakery products therefrom approximately 163 driver-salesmen and twenty-five supervisors. The driver-salesmen operate the bakery trucks throughout most of eastern Massachusetts. On each of the trucks the plaintiff's name is prominently displayed and the driver-salesmen wear uniforms on which that name is also displayed. The driver-salesmen operate over 138 routes, each of which includes portions of one or more cities and towns in the Commonwealth. On each business day each truck is loaded with fresh bakery products at the bakery in Somerville, or at the depot in Dedham, and each driver-salesman traverses a portion of his route so as to call on each customer ap-

---

[1] The application and exceptions of the statute are as follows: § 15. Not applicable to wholesalers or jobbers selling to dealers only, nor to sales for future delivery, with or without the use of samples, lists or catalogues, nor "to any dealer regularly engaged in supplying customers with fuel oil for heating or cooking purposes from a fixed place of business within the commonwealth and who does not customarily solicit direct sales from house to house or by means of outcry, sign or signal, nor to any person who peddles only fish obtained by his own labor or that of his family," farm products raised or produced by the pedler or his family, nor to certain sales for charitable purposes, "nor to persons licensed under . . . [c. 94, § 40] with respect to the sale by them of eggs, or milk, skimmed milk, cream, butter, cheese or other milk products, except frozen desserts as defined in . . . [c. 94, § 65G]." § 16. The sale of jewelry, furs, wines or spirituous liquors, and also small artificial flowers or miniature flags (except under temporary licenses under § 33) is forbidden. § 17. No license is required for the sale of newspapers, religious publications, ice, flowering plants, and such flowers, fruits, nuts and berries as are wild and uncultivated, but local authorities may regulate the sale of such without a fee and may require licenses for and regulate hawkers and pedlers in respect of sales of meats, butter, cheese, fish and fresh fruit or vegetables. If licensed under § 17 for the items last listed no license is required under § 22. § 24. Disabled veterans and blind residents may have licenses without a fee.

proximately every other day. Each driver-salesman sells and delivers to each customer such bread, cake, pies or other bakery products as the customer at that time desires. Ninety per cent of the customers have standing orders for bread, and some have standing orders for other bakery products. Driver-salesmen also may take special orders to be filled ahead, or may deliver pursuant to special orders previously received. Customers in most cases pay cash, but credit may be extended at the discretion of the driver-salesman. Driver-salesmen solicit new customers along their routes, but do not solicit sales by means of "outcry." Under union agreements Hall-Omar pays the license fees for its driver-salesmen.

The licensing requirements for hawkers and pedlers are in c. 101, § 22. The director may grant a license "to any person who files in his office a certificate signed by the mayor or by a majority of the selectmen, stating that to the best of his or their knowledge and belief the applicant . . . is of good repute as to morals and integrity, and is, or has declared his intention to become, a citizen of the United States. The mayor or selectmen, before granting such certificate, shall require the applicant to make oath that he is the person named therein, and that he is, or has declared his intention to become, a citizen of the United States." The fee for a State wide license is $50. The fees for licenses for towns range from $4 to $26 per town, and for licenses for cities from $11 to $26 per city, depending upon size. A hawker or pedler licensed under § 22 is "subject to such local rules and regulations as may be made in a city by the mayor and city council and in a town by the selectmen."

Certain exemptions are set out in c. 101, § 15. See footnote 1, *supra*. Statute 1937, c. 214, inserted the exemption of "persons licensed under . . . [c. 94, § 40] with respect to the sale by them of milk, skimmed milk, cream, butter, cheese or other milk products, except frozen desserts as defined in . . . [c. 94, § 65G]." Statute 1955, c. 757, § 11, inserted "eggs" before "milk" in the statement of this exemption.

General Laws c. 94, § 40, provides: "No person, except a producer selling milk to other than consumers, or selling not more than twenty quarts per day to consumers, shall deliver, exchange, expose for sale or sell or have in his custody or possession with intent so to do any milk, skimmed milk or cream in any town where an inspector of milk is appointed, without obtaining from such inspector a license which shall contain the number thereof, the name, place of business, residence, number of vehicles used by the licensee and the name of each driver or other person employed by him in carrying or selling milk . . . ." The fee for each license, by § 41, is fifty cents and each license is valid "until June first following" subject to suspension or revocation.

Milkmen (driver-salesmen) employed by companies licensed under c. 94, § 40, sell eggs, milk, skimmed milk, cream, butter, cheese and other milk products, except frozen desserts, over regular routes visited on alternate days. Such employees selling such products only are not licensed pursuant to c. 101. Calls on customers are made between 7 A.M. and 4 P.M. for the sale and delivery of such of the products listed as the customers desire. Most customers have standing orders for milk, and some have standing orders for eggs, butter or other milk products. Special orders to be filled later are sometimes taken. When desired by customers the employees bring the products into the house and place them in the refrigerator, sometimes with the use of a house key. The milk companies, like the bakery companies, constantly seek to increase sales and attract new customers through the efforts of the driver-salesmen. Customers pay the driver-salesman by cash or check. Credit may be extended at the employee's discretion.

The driver-salesmen of bakeries and milk companies are paid a commission on sales. Both groups of employers "compete in a common labor market for the hiring of qualified driver-salesmen."

1. General Laws c. 101 applies to Hall-Omar's employees. Section 13 provides: "Except as hereinafter ex-

pressly provided, the terms 'hawker' and 'pedler' as used in this chapter shall mean and include any person, either principal or agent, who goes from town to town or from place to place in the same town selling or bartering, or carrying for sale or barter or exposing therefor, any goods, wares or merchandise, either on foot, on or from any animal or vehicle.''

No stated exception applies to those selling bakery products. In *Commonwealth* v. *Ober*, 12 Cush. 493, 495, Shaw, C.J., said of the statute in an earlier form,[2] ''But our statute goes further, and not only proscribes actual hawkers and pedlers . . . but it extends to all persons, doing the acts prescribed.'' See also *Commonwealth* v. *Bergeron*, 296 Mass. 60 (confining sales to regular customers who have agreed to buy from the agent does not make the statute inapplicable).

There can be no doubt of the generality of the application of the statute and its application to Hall-Omar's employees in the light of the report in 1929 of a special commission to investigate the laws relating to hawkers and pedlers pursuant to Res. 1928, c. 62. This report, 1929 Senate Doc. No. 5, deals primarily with the effort to amend the statute made by ''the large baking concerns, whose business is conducted largely through selling their products by house to house delivery from wagons or vehicles.'' The commission recommended against amendments sought by the bakers to reduce the license fee or authorize one license to the employer (as the milk companies now enjoy, town by town), but it did suggest other amendments.[3]

---

[2] Statute 1846, c. 244, § 1. ''Every hawker, pedler, or petty chapman, or other person, going from town to town, or from place to place, or from dwelling-house to dwelling-house, in the same town, either on foot, or with one or more horses, or otherwise carrying for sale, or exposing to sale, any goods . . . .''

[3] The commission said in part: ''[I]n actual practice, the fee is paid by the employer rather than by the licensee. It was urged [by the bakers] that the fee was so high that its character was rather that of a tax than of a license. . . . [As to the proposals for lower fee or single license] the Commission feels that it is inadvisable to substitute a general license to the company . . . . The time may come when this plan would be feasible, but at present it is not believed that the companies have shown that they have sufficient control over

2.   The principles applicable whenever the constitutionality of a statute is attacked are well established. "Every presumption is indulged in favor of the validity of a statute." *Howes Bros. Co.* v. *Unemployment Compensation Commn.* 296 Mass. 275, 283–284, cert. den. 300 U. S. 657. *Merit Oil Co.* v. *Director of the Div. on the Necessaries of Life,* 319 Mass. 301, 305–306.   Legislative classification is valid if it is rational and bears some relationship to the object intended to be accomplished. *Maher* v. *Brookline,* 339 Mass. 209, 213, and cases cited.   There is a very wide discretion in the Legislature. *Opinion of the Justices,* 303 Mass. 631, 648.   *McGowan* v. *Maryland,* 366 U. S. 420, 425–426.   "If the question is fairly debatable, courts cannot substitute their judgment for that of the Legislature." *Druzik* v. *Board of Health of Haverhill,* 324 Mass. 129, 139. *General Elec. Co.* v. *Kimball Jewelers, Inc.* 333 Mass. 665, 675.   If a rational basis may be discerned for distinguishing between businesses which in many respects are similar, Sunday closing laws which exempt some such businesses are not unconstitutional because of the exemptions. *McGowan* v. *Maryland, supra,* 425–427.   *Gallagher* v. *Crown Kosher Super Mkt. of Mass. Inc.* 366 U. S. 617, 623–624.

their drivers to warrant such a procedure.   The Commission, however, recommends that section 23 of chapter 101 . . . be amended by striking out said section and inserting in place thereof the following . . . .   [Text of proposal omitted.]   Under the present law a county license may be issued only to a person who is peddling goods manufactured by himself.   A person who wishes to peddle goods manufactured by his employer must procure either a city or town license or a State license.   The purpose of the proposed change in section 23 is to permit a licensee to peddle goods manufactured by his employer by the payment of the fee outlined in said proposed section.   It is felt by the Commission that in view of the large amount of revenue derived from hawkers' and pedlers' licenses, such a change is desirable.   The result . . . would be to lessen considerably the burden upon drivers . . . who confine their activities within one county, and at the same time to preserve an adequate financial return to the county and State.   It is to be noted that the proposed change greatly enlarges the scope of the county license, but at the same time triples the fee therefor.   It is not deemed advisable in any way to change the conditions or cost of city and town licenses or of State licenses."   The commission (pp. 5–6) because of constitutional doubts recommended that c. 101, § 15, be amended by striking from the then exemption for wholesalers and jobbers the limitation "having a permanent place of business in the commonwealth."   This recommendation was adopted by the Legislature in St. 1929, c. 349, § 1.   Compare St. 1937, c. 333, which inserted the exemption for oil dealers "supplying customers . . . from a fixed place of business within the commonwealth."

See *Commonwealth* v. *Chamberlain,* 343 Mass. 49. See also *Mosey Cafe, Inc.* v. *Mayor of Boston,* 338 Mass. 207, 211. The burden is on the person attacking the statute to show that there is no conceivable ground for sustaining it. *Commonwealth* v. *Chamberlain, supra,* 51. But "statutes in regard to the transaction of business must operate equally upon all citizens who desire to engage in the business, and . . . there shall be no arbitrary discrimination between different classes of citizens." *Commonwealth* v. *Hana,* 195 Mass. 262, 266 (hawkers' and pedlers' law [R. L. c. 65, § 19] unconstitutional in favoring certain residents with a reduced license fee, exempting persons seventy years of age or over, and in discriminating against foreign agricultural products).

3. The underlying purpose of the regulation of itinerant selling is the prevention of fraud and imposition, and the assurance of the safety of citizens. There is also an aspect of a tax for the privilege of doing business in a special way.

In *Commonwealth* v. *Hana,* 195 Mass. 262, 265, Knowlton, C.J., said: "The business of peddling furnishes such opportunities for the practice of fraud that it is a proper subject for legislative regulation. That such regulation has been practised from early times, both in Europe and America, is shown at length by Mr. Justice Gray in *Emert* v. *Missouri,* 156 U. S. 296. The requirement of R. L. c. 65, § 19, that before receiving a license the applicant shall file a certificate from the mayor of a city or the majority of the selectmen of a town that . . . he is of good repute for morals and integrity, is a reasonable regulation for the protection of the public."

In the *Emert* case, *supra* (pp. 306-309), the court said: "In Tomlin's Law Dictionary . . . 'Hawkers. [are defined as] Those deceitful fellows who went from place to place, buying and selling . . . goods and merchandise, . . . which ought to be uttered in open market . . . .' Upon an information in the Court of Exchequer to recover penalties under . . . [50 Geo. III, c. 41] Baron Graham said: 'The object of the legislature . . . was to protect, on the one

hand, fair traders, particularly established shopkeepers, resident permanently in towns and other places, and paying rent and taxes there for local privileges, from the mischiefs of being undersold by itinerant persons, to their injury; and, on the other, to guard the public from the impositions practised by such persons in the course of their dealings; who, having no known or fixed residence, carry on a trade by means of vending goods conveyed from place to place by horse or car.' *Attorney General* v. *Tongue,* (1823) 12 Price, 51, 60. . . . In Michigan [*People* v. *Russell,* 49 Mich. 617, 619] . . . Chief Justice Cooley said: '. . . The requirement of a license gives opportunity for inquiry into antecedents and character, and the payment of a fee affords some evidence that the business is not a mere pretence.' "

In *Commonwealth* v. *Farnum,* 114 Mass. 267, 270 (1873), an employee of Florence Sewing Machine Company was held not subject to the then statute, as his custom was to take orders. The court said, "A hawker and peddlar is an itinerant trader, who goes from place to place, and from house to house . . . . He generally deals in small and cheap articles . . . . Such hawker and peddlar, or any other person who does the same business in the same manner, if unlicensed, is liable to punishment under the Gen. Sts. c. 50, § 27." Compare *Commonwealth* v. *Reid,* 175 Mass. 325, where the conviction of an agent who sold ice by outcry was sustained.

4. Hall-Omar contends that, even in the absence of discrimination between like businesses, the statute is unreasonable in its application to business such as that done by it or by the milk companies.

We agree that the business of selling foodstuffs from trucks as now carried on by such a bakery as Hall-Omar and by milk companies has few of the attributes which historically have justified such regulations as set out in G. L. c. 101. On this case stated we are free to draw such inferences as we think justified. G. L. c. 231, § 126. *Yates* v. *Salem,* 342 Mass. 460, 461. The agreed facts do not state it, but we infer that the sales of bakery products and dairy

products from the trucks are at fixed prices, that the accounting practices are such that the employers have a satisfactory check on sales and inventories, and that the characteristics of a permanent business are paramount.

The new and reassuring aspects of such itinerant selling, although clearly shown, do not mean that the business may not be specially regulated. It is sufficiently differentiated from the business of selling from fixed sites to be the subject of a separate classification. Hall-Omar's attack must, therefore, rest on the claim of discrimination. Nevertheless, the circumstance that much itinerant business is permanent in character and self-regulated is relevant to the commissioner's claim of the severability of the dairy exemption. See point 6, *post.*

5. We turn to Hall-Omar's contention that, even if the statute is constitutionally applicable to businesses like its own, developments since 1929 make the application of c. 101 to its business and driver-salesmen unreasonable and discriminatory, particularly the exemption in 1937 of the household delivery of dairy products. See *Vigeant* v. *Postal Tel. Cable Co.* 260 Mass. 335.

The following statutory changes, among others, have been made since the commission's report in 1929: Statute 1929, c. 349, § 6, authorized county licenses, with fees for the several counties ranging from $4 to $10. The $10 fee was applicable in Suffolk, Essex, Middlesex, and Worcester. This became G. L. (Ter. Ed.) c. 101, § 23. In 1961, however, county licenses were abolished by the repeal of c. 101, § 23. The repealing statute (St. 1961, c. 293, § 2), approved March 29, 1961, was made effective as an emergency law March 30, 1961, the stated reasons being the purpose of having the licensing fees uniform throughout the State, and that the beginning of the licensing season was April 1.

In the meantime St. 1937, c. 214, inserted in c. 101, § 15, the exemption of dairy products and St. 1955, c. 757, § 11, added eggs to the dairy exemption. Also in 1937 (St. 1937, c. 333) there was inserted the exemption of fuel oil suppliers. See footnote 1, *supra.*

Hall-Omar stresses the similarity of its business to that of milk companies, the different requirements for obtaining licenses, and the great disparity in fees consequent upon the abolition of county licenses.

The commissioner's brief contends that discrimination between the similar businesses is justified because of (1) the possible differences in the way the businesses are conducted and (2) the differences in the products sold.

The commissioner, in respect of the first alleged ground of distinction, points to the consideration of the matter by the 1929 commission and its conclusion "that the companies have [not] shown sufficient . . . control over their drivers." The brief suggests that "[p]resumably by 1937 the Legislature was satisfied that in these respects the milk sales companies differed from the bakery companies, . . . and thus, for the milk companies, licensing under chapter 94 was sufficient."

This conceivably accounts for the 1937 amendment. But our task is to decide whether there is unjustified discrimination in 1962.

We conclude that Hall-Omar and the milk companies exercise that supervision over their many driver-salesmen which will tend to develop good will and a large number of satisfied regular customers. They "compete in a common labor market for the hiring of qualified driver-salesmen." We conclude that neither business offers significant likelihood of fraud or imposition on customers or risk of harm to citizens.

We turn to the difference in the products sold. The commissioner admits that "bakeries are subject to fairly comprehensive statutes and regulations relating to sanitary conditions in the manufacture and handling of their products" (G. L. c. 94, §§ 2–6, 9A–10; Rules and Regulations of Department of Public Health Relative to Bakeries and Bakery Products), and that "bread and rolls are similarly regulated as to quality, labelling, weight and marking" (G. L. c. 94, §§ 7–9; Rules and Regulations of Department of Public Health Relative to the Enrichment of Flour,

White Bread and Rolls). But the commissioner points to the sale of "other bakery products" such as pies, doughnuts, eclairs, cakes, muffins, and cookies — "an unlimited variety of exotic foods . . . not . . . staples" — which "come in an infinite variety of shapes, sizes, weights and ingredients." By contrast, the commissioner contends that "eggs, butter, milk and cheese . . . may be classed as fungible goods," the quality, marking and sale of which are meticulously regulated by statute. We think this distinction is insufficient in view of our conclusions in the next preceding paragraph. The bakery goods of Hall-Omar are made by an established concern whose success depends upon established custom. The employer determines the products to be sold and their ingredients, and, as we infer, the prices. The sales are by employees whom we infer are continued as such because found competent to conduct the established business. We see no significant likelihood that the evils to be guarded against by the hawkers' and pedlers' law will develop in the incidental sale of special cakes.

If it is desirable to regulate the weight, size, or price of bakery specialties to a greater extent than now, that is of equal concern as to sales made from fixed stores. The regulation under G. L. c. 101 is inappropriate and ineffective in respect thereof. It gives no supervision in these matters. The only policing which is afforded by c. 101 is in the threshold requirements of citizenship, or application therefor, and of vouching by the mayor or a majority of the selectmen and verification by oath.

The commissioner notes that municipalities have milk inspectors specially charged to police the quality of milk and cream (G. L. c. 94, § 35), that the labeling, marking, packaging and quality of butter and cheese are regulated by c. 94, §§ 49–62, and that the sizing, marking, advertising and quality of eggs are controlled by c. 94, §§ 89–92A. These statutory controls apply equally to such foodstuffs wherever sold. The absence of similar controls for bakery specialties suggests less public concern in respect thereof rather than a basis for requiring a pedler's license for sales from trucks.

Milk companies, by c. 94, § 40, for a nominal fee, obtain a single license in each municipality, applicable to all their employees. This enables them to sell milk, skim milk and cream. Their employees under such a license may also by c. 101, § 15, sell eggs, butter and cheese. That is, they may sell these last named products door to door without any license in respect thereof. The license requirements under c. 101 are plainly more onerous. It is a necessary inference that milk companies pay nothing for the privilege of peddling as the nominal fee of fifty cents can be no more than enough to meet the cost of issuing and keeping track of the municipal licenses for the sale of milk, skim milk and cream.

Chapter 101 is a substantial source of revenue and the license fee is in effect a tax. In the 1929 report of the special commission, *supra,* note was taken of the importance of the revenue from the bakery licenses. Statute 1937, c. 333, which added the peddling of fuel oil to the exemptions of c. 101, § 15, was passed over the Governor's veto. The veto message (1937 Senate Doc. No. 438) points out that if the exemption were granted it could be argued that other necessities of life should also be exempted such as "food and provisions"; such further exemptions would make the statute regulating peddling null and void and "there is also the very pertinent element of revenue. . . . If the signing of this legislation precipitated petitions for legislation for the exemption of pedlers of other commodities, then the revenue from such source amounting to $125,000 annually, which is distributed between the Commonwealth and the cities and towns, would represent a sizeable revenue which is needed." The repeal in 1961 of the county license provision also suggests an interest in revenue.

There is no comparable aspect of tax in the license fees under c. 94, § 41; indeed, a substantial part of the business of milk companies (eggs, butter and cheese) is conducted without the payment of any fee applicable thereto.

Furthermore, the exemption in § 15 of all selling "for future delivery" permits milk companies to make use of

their exempt peddling of the staple product, milk, for which a house to house demand exists, to build an itinerant business in all other products not prohibited by the statute, such as fruit juices, bottled sodas, eggnog mixes, jams, and peanut butter.

Milk is a subject of special statutory concern. See (in addition to the regulations in G. L. c. 94, §§ 12–48C) G. L. c. 94A, §§ 1–27, the Milk Control Law, especially § 11, providing for the fixing of minimum prices. But that does not justify unequal application of laws regulating itinerant selling. Section 15 gives milk companies full exemption from the requirement of a hawker's and pedler's license. It is thus a regulation of itinerant selling which makes an arbitrary distinction between businesses which, so far as their attributes relevant to such classification are concerned, are alike. We perceive no basis for the distinction "reasonably related to the purposes which the regulations seek to accomplish." *Maher* v. *Brookline,* 339 Mass. 209, 213. *Vigeant* v. *Postal Tel. Cable Co.* 260 Mass. 335.

Although the agreed facts state no details as to other bakeries, it is a reasonable inference that Hall-Omar's method of conducting the house to house sale and delivery business in bakery goods is not unique. Nevertheless, we must assume in favor of the validity of the legislative classification that there are itinerant bakery businesses which are not self-regulating in the respects relevant to G. L. c. 101, and that there may be more such than there are comparable itinerant milk businesses, and that offences against public policy may be greater in the bakery business.

Such assumptions do not overcome the arbitrary operation of the statute. There is nothing inherent in the sale of bakery goods which justifies classifying Hall-Omar with offending itinerants in the same field. Compare the status of jewelry, furs, wines and spirits which under § 16 may not be peddled at all. Classifications such as are made by § 16 do not permit or require precision and are not invalid because some well conducted businesses may be included in the prohibition. See *Gallagher* v. *Crown Kosher Super*

*Mkt. of Mass. Inc.* 366 U. S. 617, 624. Chapter 101, § 15, by contrast permits the itinerant sale of bakery goods and dairy products and, as stated, the facts show that there is nothing in the nature of the former to support the requirement of a license under c. 101 to do business therein in a sound and inoffensive way while at the same time the chapter exempts similar business in dairy products from all license requirements under the chapter.

6. The commissioner contends that, in any event, we should apply the principle of *Commonwealth* v. *Petranich,* 183 Mass. 217. In that case the defendant was convicted for violation of a statute prohibiting the sale of wine without a license and the statute excluded from its operation sales of wine made within the Commonwealth. This court held that this exclusion was unreasonably discriminatory but that it was not such a substantial part of the law that its unconstitutionality defeated the whole statute. The commissioner urges that the exception of milk dealers is severable because added by an amendment.

We think the principle of the *Petranich* case inapplicable. The statute, as amended, must be judged in its application to business as now conducted. The Legislature has expressly indicated that sales of dairy products and fuel oil are to be exempt; there is no basis for assuming an intent that those exemptions should fail in the event that there are other businesses equally entitled to exemption. *Commonwealth* v. *Hana,* 195 Mass. 262, 267–268. The inapplicability of the historical justifications of the statute in respect of businesses conducted as are Hall-Omar's bakery and the dairy household delivery business also speaks against severing the dairy exemption.

7. Hall-Omar contends that there are other unreasonable discriminations in the statute. The statute has, by accretions over the years, become to a degree a "hodgepodge" (*Crown Kosher Super Mkt. of Mass. Inc.* v. *Gallagher,* 176 F. Supp. 466, 472), but we do not reach the issue of other discriminations. See, however, *Healy* v. *Ratta,* 67 F. 2d 554 (1st Cir., reversed on other grounds, 292 U. S.

263), holding unconstitutional a somewhat similar statute of New Hampshire; *State* v. *Whitcom,* 122 Wis. 110, 114, 119, 120, 121. See also *Commonwealth* v. *Caldwell,* 190 Mass. 355; *Commonwealth* v. *Hana,* 195 Mass. 262; *Opinion of the Justices,* 324 Mass. 724, 734; *Takahashi* v. *Fish & Game Commn.* 334 U. S. 410; *Marallis* v. *Chicago,* 349 Ill. 422; *State* v. *Garbroski,* 111 Iowa, 496; *State* v. *Shedroi,* 75 Vt. 277. Compare *Brown* v. *Russell,* 166 Mass. 14; *Mayor of Lynn* v. *Commissioner of Civil Serv.* 269 Mass. 410, 414–415; *Opinion of the Justices,* 324 Mass. 736, 740– 742; *McNamara* v. *Director of Civil Serv.* 330 Mass. 22, 25–26.

8. A decree is to enter declaring that the hawkers' and pedlers' statute as contained in G. L. c. 101 is unconstitutional in its application to the plaintiff in view of the exemption in respect of milk companies and the sale of dairy products.

*So ordered.*