## District Attorney for the Suffolk District *vs.* James Watson & others.[1]

Suffolk.   May 29, 1980. — October 28, 1980.

Present: Hennessey, C.J., Quirico, Braucher, Kaplan, Wilkins, Liacos, & Abrams, JJ.

*Homicide.   Constitutional Law,* Cruel and unusual punishment. *Death Penalty.   Practice, Civil,* Declaratory relief.

Discussion of the provisions of c. 488 of the Acts of 1979. [651-654]

Discussion of authorities pertaining to the constitutionality of the death penalty. [655-659]

A complaint brought against four defendants, indicted for murder in the first degree, by the district attorney for the Suffolk district seeking a declaratory judgment as to the constitutionality of c. 488 of the Acts of 1979, a capital punishment statute, presented an actual controversy within the meaning of G. L. c. 231A, § 1, established exceptional circumstances warranting relief despite the pendency of the criminal prosecutions, and demonstrated the plaintiff's standing to secure resolution of the dispute. [659-660]

In light of contemporary standards of decency, the death penalty is unconstitutionally cruel under art. 26 of the Declaration of Rights of the Massachusetts Constitution. [660-665]

In light of the arbitrariness and discrimination inherent in the application of capital punishment, the death penalty is unconstitutionally cruel under art. 26 of the Declaration of Rights of the Massachusetts Constitution. [665-671]

Braucher, J., concurred on the ground that the imposition of a death sentence which will rarely be carried out and only after months and years of uncertainty is cruel and unusual in violation of art. 26 of the Declaration of Rights of the Massachusetts Constitution. [672-673]

Wilkins, J., concurred, with the reservation that the Court should have postponed determining the constitutionality of the death penalty until it was presented with an actual case in which a defendant had been sentenced to death under the statute. [673-674]

Liacos, J., concurred, discussing the nature of the death penalty and stating that the phrase "cruel or unusual" as used in art. 26 of the Declaration of Rights of the Massachusetts Constitution has a meaning

---

[1] Michael Amann, Lawrence Licciardi and John Real.

distinct from the phrase "cruel and unusual" in the Eighth Amend-
ment to the United States Constitution and that, under art. 26, a pun-
ishment may not be inflicted if it be either cruel or unusual. [675-686]
QUIRICO, J., dissented on the ground that the court, by ignoring tradi-
tional standards of review, has infringed on the Legislature's pre-
rogative to define crimes and establish the terms of punishment.
[686-701]


CIVIL ACTION commenced in the Supreme Judicial Court
for the county of Suffolk on January 9, 1980.

The case was reported by *Quirico, J.*

*William P. Homans, Jr. (John Reinstein* with him) for
James Watson.

*Stephen L. Saltonstall (Ann Lambert Greenblatt* with
him) for John Real.

*Barbara A. H. Smith,* Assistant Attorney General, for the
Attorney General.

*Newman Flanagan,* District Attorney, pro se (*Michael J.
Traft,* Assistant District Attorney, & *Rosalind Henson
Miller,* Special Assistant District Attorney, with him).

*Henry P. Arsenault,* amicus curiae, pro se, submitted a
brief.

*Jeanne Baker, Daniel Featherston, Andrew Good, Joseph
S. Oteri, P. J. Piscitelli, Harvey A. Silverglate & Martin G.
Weinberg,* for the Massachusetts Association of Criminal
Defense Lawyers, amicus curiae, submitted a brief.

HENNESSEY, C.J. On January 9, 1980, the plaintiff, in his
capacity as district attorney for the Suffolk district, filed a
complaint in the Supreme Judicial Court for Suffolk County
seeking a declaratory judgment or, in the alternative, relief
under this court's general superintendence powers under
G. L. c. 211, § 3. The complaint sought a determination of
the constitutionality of the recently enacted capital punish-
ment statute, c. 488 of the Acts of 1979. The Common-
wealth and the judges of the Superior Court were named as
defendants. The single justice allowed the motion of the
Attorney General to intervene as a defendant. The single
justice also allowed the Attorney General's motion to dis-

miss filed on behalf of the Commonwealth and the judges of the Superior Court, and permitted the intervention of four men as defendants, all of whom are awaiting trial on first degree murder indictments which may subject them to the death penalty under the statute. The parties filed a statement of agreed facts. Thereafter, on a motion joined by all the parties, the single justice reserved and reported the case to the full bench of this court.

Two issues are before this court today: (1) whether the court may entertain a suit for a declaratory judgment concerning the validity of c. 488 of the Acts of 1979 during the pendency of a criminal prosecution brought pursuant to the contested chapter, and (2) whether c. 488 of the Acts of 1979 violates art. 26 of the Declaration of Rights of the Massachusetts Constitution. We conclude that under the particular circumstances of these cases declaratory relief is the appropriate vehicle for resolving the constitutionality of the statute in question. We conclude furthermore that c. 488 of the Acts of 1979 contravenes the prohibition against cruel or unusual punishment contained in art. 26 of the Declaration of Rights on each of two grounds: (1) the death penalty is unacceptably cruel under contemporary standards of decency, and (2) the death penalty is administered with unconstitutional arbitrariness and discrimination.[2]

---

[2] Conventional debate and analysis have paid much attention to the question of "deterrence," the contention being that capital punishment is unconstitutional in the absence of a demonstration that it serves as a stronger deterrent than life imprisonment. In *Opinions of the Justices,* 372 Mass. 912, 921 (1977), a majority of the Justices speculated that there might be some types of homicide (perhaps one or more of those referred to in the "aggravated circumstances" of statutes like the present) as to which that demonstration might conceivably be made; and it was intimated that the findings of a legislative commission particularly studying those questions could be significant. No legislative study so directed has been made. However, out of respect to the blanket legislative declarations set out in § 1 of the present statute, the same majority of the Justices are content for purposes of the present case to pretermit the question of deterrence and proceed to the issues of contemporary standards of decency and of arbitrariness. The latter approaches were mentioned as alternatives in *Opinions of the Justices, supra,* and in *Commonwealth* v. *O'Neal,* 369 Mass. 242, 278-279 (1975) (*O'Neal II*). (Kaplan, J., concurring).

*The Statute*

The general design of c. 488 is to provide a dual pro-
cedure when a defendant is charged with murder in the first
degree. The first phase is to consist of trial of the charge. If
the jury[3] find the defendant guilty, then there is a second,
separate presentencing hearing before the same jury in
which argument and evidence may be adduced relevant to
certain factors or standards described in the statute intend-
ed to single out those offenders who merit capital punish-
ment. The jury are to decide on the evidence thus brought
forward whether sentence of death, rather than life im-
prisonment, is to be imposed. When sentence of death is
passed, there is a special review by the Supreme Judicial
Court to guard further against arbitrary or capricious im-
position of the death penalty.

To describe the four sections of the statute in greater de-
tail: Section 1 prefaces the substantive requirements of the
remaining three sections with a general declaration of the
utility of capital punishment as a deterrent to crime and the
appropriateness of such punishment being imposed by the
Legislature. Section 2 amends c. 265 of the General Laws
to provide that those convicted of murder in the first degree
may only suffer the punishment of death pursuant to pro-
cedures set forth in those amendments to G. L. c. 279, §§ 53-
56, enacted in § 3.

Section 3 of c. 488 would add to G. L. c. 279 the four new
sections (§§ 53-56) mentioned above which describe the
sentencing procedure. On the return of a verdict of guilty
of murder in the first degree a presentencing hearing would
be held before the same jury to determine the punishment to
be imposed. Argument on both sides would be presented,
the Commonwealth presenting the opening argument and
the defendant presenting the closing argument, and evi-
dence would be received to assist the jury in determining
whether any mitigating or aggravating circumstances, as

---

[3] A defendant in a capital case currently has no right to a jury waived
trial. G. L. c. 263, § 6.

defined in § 54, exist and whether to recommend that the death penalty be imposed. If the sentence of death is reversed on appeal for error found only in the presentencing hearing, any new trial would relate only to the issue of punishment (§ 53).

The imposition of the death penalty is limited to those cases in which one or more of the enumerated statutory aggravating offenses are found to exist beyond a reasonable doubt. Additionally, the jury are permitted to consider any other appropriate aggravating or mitigating circumstances, some of these mitigating circumstances being enumerated in the statute (§ 54 [*b*]). The jury must find a statutory aggravating circumstance before recommending a sentence of death, but need not find any mitigating circumstance in order to make a binding recommendation of mercy.

Included in the aggravating matter that might be entertained are twelve statutory aggravating circumstances which point more particularly to the nature of the offense or the kind of victim or offender (§ 54 [*a*]). Illustrative are: "(1) The offense of murder was committed on the victim who was killed while serving in the performance of his duties as a police officer, firefighter, or correctional officer; (2) The offense of murder was committed by a person who had previously been convicted of the crime of murder in the first degree"; "(11) The offense of murder was committed by a person in connection with the commission of rape or an attempt to commit rape on the victim." (The other statutory aggravating circumstances are reproduced in the margin.[4]) Mitigating matter would include five statutory cir-

---

[4] "(3) The offender committed the offense of murder for himself or another, for the purpose of receiving money or any other thing of monetary value.

"(4) The offender caused or directed another to commit murder as an agent or employee of another person.

"(5) The offender by his act of murder knowingly created a great risk of death to more than one person in a public place by means of a weapon or device which would normally be hazardous to the lives of more than one person.

cumstances (§ 54 [*b*]) of which the following are illustrative: "(1) The offense of murder was committed by one with no history of prior criminal activity"; "(5) The age or mental capacity of the defendant at the time of the crime." (The other statutory mitigating circumstances are reproduced in the margin.[5])

The appropriate statutory instructions must be given in writing to the jury for their deliberations (§ 54 [*b*]). The jury must designate in writing the aggravating circumstance or circumstances (of which at least one must be a statutory aggravating circumstance) which they find beyond a reasonable doubt and upon which they base their unanimous recommendation of death. Where such a statutory aggravating circumstance is found and a recommendation of death is made, the judge must impose the death sentence (§ 55). If a recommendation of death supported by a finding of at least one of the statutory aggravating circumstances is not made by the jury, then the judge may not impose the death sentence except that no finding of statutory

---

"(6) The offense of murder was committed on the victim during the course of a hijacking or attempted hijacking of an airplane or school bus.

"(7) The capital felony was committed by a person under sentence of imprisonment.

"(8) The defendant was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person.

"(9) The defendant knowingly created a great risk of death to many persons.

"(10) The capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody.

. . .

"(12) The offense of murder was committed on the victim in the course of a kidnapping for ransom of the victim or attempted kidnapping for ransom of the victim."

[5]"(2) The offense of murder was committed by one who was under the influence of extreme mental or emotional disturbance.

"(3) The offense of murder was committed by one who was a participant in the defendant's homicidal conduct or consented to the homicidal act.

"(4) The offense of murder was committed by one under duress or under domination of another person."

aggravating circumstance is necessary in offenses of treason or aircraft hijacking (§ 55).[6]

There would be an automatic review by the Supreme Judicial Court of any death sentence imposed (§ 56 [*a*]). Besides considering any errors of law claimed to have been committed in the sentencing proceeding (§ 56 [*b*]), the court would consider the propriety or fairness of the punishment itself according to stated criteria, one of which examines "whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor" (§ 56 [*c*] [1]). In order to comply with § 4 of the statute, the court must include in its decision "a reference to similar cases which it took into consideration" (§ 56 [*e*]), the records of such cases being accumulated and extracts being provided to the court by the executive secretary to the Justices of the Supreme Judicial Court. In addition to its authority regarding correction of errors, the Supreme Judicial Court has authority to affirm the sentence of death or to set aside the sentence of death and remand the case for resentencing by the trial judge (§ 56 [*e*]).

## The Facts as to the Four Defendants.

The facts pertaining to each of the four defendants, as presented in the parties' statement of agreed facts, can be summarized as follows. In January, 1980, the Suffolk County grand jury indicted the defendant James Watson for the crime of murder in the first degree. The indictment charges that "James J. Watson on the 16th of November, 1979, did assault and beat one Jeffrey S. Boyajian with intent to murder him and by such assault and beating did kill and murder the said Jeffrey S. Boyajian." On January 24, 1980, the defendant Watson was arraigned and is currently awaiting trial. The district attorney has announced that he will seek the imposition of the death penalty for the defendant Watson on the basis that one of the statutory aggravating circumstances is present in this case, namely, that

---

[6] Section 54 (*a*) (6), however, identifies aircraft hijacking as a statutory aggravating circumstance. See note 4, *supra*.

"the offender committed the offense of murder for himself or another, for the purpose of receiving money or any other thing of monetary value."

On February 6, 1980, the Suffolk County grand jury indicted the defendants Lawrence Licciardi and Michael Amann for the crimes of murder in the first degree, kidnapping, and two counts of rape of a child. The indictments each charge individually that Licciardi and Amann "on the 23rd of November, 1979, did assault and beat one Kathleen Boardman with intent to murder her and by such assault and beating did kill and murder the said Kathleen Boardman." On February 7 and 19, 1980, the defendants Licciardi and Amann, respectively, were arraigned in Superior Court and are currently awaiting trial. The district attorney has announced that in each case he will seek imposition of the death penalty as authorized by c. 488 of the Acts of 1979 when "the offense of murder [is] committed by a person in connection with the commission of rape or an attempt to commit rape on the victim."

A Norfolk County grand jury has indicted John Real for murder in the first degree. The indictment charges Real with the murder of Vance J. Farmer on February 2, 1980. At that time Real was under sentence of imprisonment and, thus, if convicted of murder in the first degree, could be sentenced to death under the provision of c. 488 which designates this as one of the aggravating circumstances.

*Recent History of the Death Penalty.*

The history of the death penalty and the debate between its proponents and opponents reaches back for generations. Prior to the 1960's it was assumed in this country that death was a constitutionally permissible punishment which Legislatures could choose as the proper response to certain crimes. See *McElvaine* v. *Brush,* 142 U.S. 155 (1891); *State* v. *Olander,* 193 Iowa 1379 (1922); *State* v. *Miller,* 165 Kan. 228 (1948). During this period condemned defendants challenged primarily the means by which the death penalty was carried out, see, e.g., *In re Kemmler,* 136 U.S. 436 (1890) (electrocution is a permissible method of execution);

*Wilkerson* v. *Utah,* 99 U.S. 130 (1878) (public execution by shooting upheld), or the procedural propriety of the trial; cf. *Coleman* v. *Alabama,* 389 U.S. 22 (1967) (racial discrimination in jury composition). "As one author on the subject of capital punishment litigation in the 1960's points out, if the condemned's lawyer failed to see the procedural errors in a given case or if there were simply none, the condemned individual like the moneyless patient with a commonplace disease, was simply 'out of luck.'" Note: Furman to Gregg: The Judicial and Legislative History, 22 How. L.J. 53, 65 (1979), quoting from M. Meltsner, Cruel and Unusual: The Supreme Court and Capital Punishment 19 (1974).

In October, 1963, Mr. Justice Goldberg published a dissenting opinion, jointed by Messrs. Justice Brennan and Douglas, in which he argued that the Supreme Court should decide whether infliction of the death penalty for rape was constitutional. See *Rudolph* v. *Alabama,* 375 U.S. 889 (1963). "Following the *Rudolph* dissent, a large number of cases were brought to the Supreme Court squarely presenting the issue of the constitutionality of the death penalty [, an issue] which . . . had never been explicitly presented to the Court or even raised in the lower courts." Goldberg, The Death Penalty and the Supreme Court, 15 Ariz. L. Rev. 355, 365 (1973). At the same time, the procedural challenges to death penalty statutes continued with increasing success. In *United States* v. *Jackson,* 390 U.S. 570 (1968), the Supreme Court invalidated the death penalty provision of the Lindbergh Law (Federal Kidnapping Act, 18 U.S.C. § 1201[a]) because it impaired a defendant's exercise of his Fifth Amendment right against self-incrimination and his Sixth Amendment right to a jury trial by making defendants risk death only if they went to trial before a jury instead of either pleading guilty or waiving their right to a jury trial. In *Witherspoon* v. *Illinois,* 391 U.S. 510 (1968), the Court held with full retroactive effect (*id.* at 523 n.22), that veniremen could not be eliminated from a jury merely because they had conscientious scruples against capital

punishment. Due to such decisions, and to the pendency of other procedural and substantive challenges to the constitutionality of the death penalty in the United States, executions throughout the nation were stayed by court orders.

In June, 1972, the Supreme Court rendered a five-to-four decision in the case of *Furman* v. *Georgia,* 408 U.S. 238 (1972), which has since become the touchstone for constitutional analysis of the death penalty. Two Justices (Marshall and Brennan) in the five judge majority expressed the view that capital punishment was per se unconstitutional as cruel and unusual punishment. The other three held that capital punishment as currently administered violated the Constitution because of its arbitrary imposition on a small percentage of eligible defendants due to the lack of standards to guide the discretion of juries and judges. As a result of this decision, many States enacted new death penalty statutes in an effort to comply with the somewhat vague requirements of *Furman.* Most of the statutes either made the death penalty mandatory for certain offenses or promulgated sets of "standards," often presented in the form of aggravating or mitigating circumstances for the guidance of juries in the selection of those who were to die.

In July, 1976, the Supreme Court ruled on five selected capital sentencing cases,[7] each involving a challenge to the constitutionality of a State statute passed in response to *Furman.* The Court upheld three of the State statutes (those of Georgia, Florida, and Texas), and struck down two (those of Louisiana and North Carolina). The principal distinction was that the valid statutes provided judges and juries with guidance, in the form of detailed mitigating and aggravating circumstances, for deciding whether the death sentence was appropriate in each case. A bare majority of the Court also held that the States may not impose manda-

---

[7] *Gregg* v. *Georgia,* 428 U.S. 153 (1976). *Proffitt* v. *Florida,* 428 U.S. 242 (1976). *Jurek* v. *Texas,* 428 U.S. 262 (1976). *Woodson* v. *North Carolina,* 428 U.S. 280 (1976). *Roberts* v. *Louisiana,* 428 U.S. 325 (1976).

tory capital punishment laws requiring that every convicted murderer be sentenced to death. *Woodson* v. *North Carolina*, 428 U.S. 280, 301 (1976). Subsequent Supreme Court litigation regarding the death penalty has involved efforts to clarify the requirements and implications of *Furman* and its progeny, see *Godfrey* v. *Georgia*, 446 U.S. 420 (1980) (statutory aggravating circumstance excessively broad and vague as interpreted by the Supreme Court of Georgia), or efforts to challenge the procedural aspects of the imposition of the death penalty. See *Beck* v. *Alabama*, 447 U.S. 625 (1980) (death sentence may not constitutionally be imposed after jury verdict of guilty of capital offense where jury were not permitted to consider verdict of guilty of lesser included offense). In each case since *Furman*, Mr. Justice Marshall and Mr. Justice Brennan have continued to express their opinions that the death penalty is in all circumstances cruel and unusual punishment prohibited by the Eighth and Fourteenth Amendments to the United States Constitution.

The history of the death penalty in the Supreme Judicial Court of Massachusetts consists basically of two matters. In the first of these, *Commonwealth* v. *O'Neal*, 369 Mass. 242 (1975) (*O'Neal II*), a majority of this court held that a mandatory death penalty for rape-murder constituted cruel or unusual punishment in violation of art. 26 of the Declaration of Rights of the Massachusetts Constitution. In *Opinions of the Justices*, 372 Mass. 912 (1977), the Justices were asked to express their opinions concerning the constitutionality of 1972 House Bill No. 3373, which contained essentially the same substantive provisions as c. 488 of the Acts of 1979 which is before the court today. In their opinion, five Justices of this court gave the following response: "Holding the same overriding view as was expressed by a majority of this court in *O'Neal II*, [369 Mass. 242 (1975)], the undersigned Justices answer that art. 26 of the Declaration of Rights — 'No magistrate or court of law, shall . . . inflict cruel or unusual punishments' — forbids the imposition of a death penalty in this Commonwealth in the absence of a showing on the part of the Commonwealth that the availability of

that penalty contributes more to the achievement of a legitimate State purpose — for example, the purpose of deterring criminal conduct — than the availability in like cases of the penalty of life imprisonment." *Opinions of the Justices, supra* at 917.

*Declaratory Relief Is Appropriate.*

In order for a declaratory judgment to issue under G. L. c. 231A, the plaintiff must demonstrate that an actual controversy exists and that he has legal standing to sue. *Massachusetts Ass'n of Independent Ins. Agents & Brokers, Inc.* v. *Commissioner of Ins.,* 373 Mass. 290, 292 (1977). Both of these requirements are satisfied in the instant case. An actual controversy within the meaning of G. L. c. 231A, § 1, is a "real dispute" caused by the assertion by one party of a duty, right, or other legal relation in which he has a "definite interest," in circumstances indicating that failure to resolve the conflict will almost inevitably lead to litigation. *Bunker Hill Distrib., Inc.* v. *District Attorney for the Suffolk Dist.,* 376 Mass. 142 (1978). *Hogan* v. *Hogan,* 320 Mass. 658, 662 (1947). An actual controversy can exist whether or not the plaintiff's rights have already been impaired. *School Comm. of Cambridge* v. *Superintendent of Schools of Cambridge,* 320 Mass. 516, 518 (1946).

In the cases under consideration here, the plaintiff asserts and the defendants deny that c. 488 is consistent with art. 26 of the Declaration of Rights. Thus these cases come within the class of cases in which an actual controversy exists: "The cases in which an actual controversy concerning criminal statutes has been found generally involved constitutional challenges to the facial validity of legislation or to its validity as applied to a class of persons similarly situated." *Bunker Hill, supra* at 145.

Ordinarily declaratory relief will not be granted during the pendency of a criminal prosecution. *Norcisa* v. *Selectmen of Provincetown,* 368 Mass 161, 170-172 (1975). The purpose of this limitation is to prevent "fragmentation and proliferation of litigation and disrupt[ion of] the orderly administration of the criminal law." *Id.* at 172. However,

a declaratory judgment is appropriate, despite a pending criminal action in "very special circumstances." *Id.* at 171. See *P.B.I.C., Inc.* v. *District Attorney of Suffolk County,* 357 Mass. 770, 771 (1970); *Kenyon* v. *Chicopee,* 320 Mass. 528, 535 (1946). We conclude that the cases at bar are clearly exceptional ones justifying declaratory relief to prevent disruption of the orderly administration of criminal justice.

A determination of the validity of c. 488 is of fundamental importance to the plaintiff because he is bound by the oath and duties of his office to enforce the law of the Commonwealth as enacted by the Legislature and is also required to uphold the Constitution of the Commonwealth as interpreted by this court. At the present time, the plaintiff's duties with respect to the enforcement of c. 488 of the Acts of 1979 are uncertain. This statute will affect every district attorney in the Commonwealth and thus presents a matter of public importance beyond the parties. Under the statute all district attorneys will be responsible for requesting that certain extraordinary procedures be followed in first degree murder prosecutions, including holding a voir dire of each prospective juror concerning his or her view of the death penalty; deciding in which cases to hold a bifurcated trial; and presenting evidence at the second half of the bifurcated trial. Of course, none of these procedures will be necessary if c. 488 is held unconstitutional. The plaintiff also satisfies the standing requirement for pursuing declaratory relief since affording him declaratory relief pursuant to G. L. c. 231A would relieve him of uncertainty with respect to his duties in enforcing the law and in administering prosecutions of first degree murder cases in Suffolk County. Similarly, the four defendants charged with murder will be afforded declaratory relief from present uncertainties which in turn, to say the least, will affect major decisions in their defenses.

I. THE DEATH PENALTY IS OFFENSIVE TO CONTEMPORARY STANDARDS OF DECENCY.

The particular standard we examine today is that established by art. 26 in its prohibition of cruel or unusual

punishment. While the word "unusual" may suggest the need for an ongoing comparison of punishments meted out for comparable crimes in similar cultures, we focus instead on the constitutional prohibition of "cruel" punishments. All punishments might be said to be cruel, but what we examine here is the question of punishment which is too cruel under constitutional standards. Also, we focus on the absolute and irreversible punishment of death, as distinguished from all lesser penalties.

The constitutional prerogatives and duties of this court permit, indeed require, a reexamination of the death penalty to determine whether it is unconstitutionally cruel in light of contemporary circumstances. "Certainly at the time of its adoption, art. 26 was not intended to prohibit capital punishment. Capital punishment was common both before and after its adoption. However, art. 26, like the Eighth Amendment, 'must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.' *Trop* v. *Dulles*, 356 U.S. 86, 101 (1958)." *Commonwealth* v. *O'Neal*, 367 Mass. 440, 451 (1975) (*O'Neal I*) (Wilkins, J., concurring). "A constitutional provision 'is enacted, it is true, from an experience of evils, but its general language should not, therefore, be necessarily confined to the form that evil had theretofore taken. Time works changes, brings into existence new conditions and purposes. Therefore a principle to be vital must be capable of wider application than the mischief which gave it birth.'" *Furman* v. *Georgia*, 408 U.S. 238, 263-264 (1972) (Brennan, J., concurring), quoting from *Weems* v. *United States*, 217 U.S. 349, 373 (1910). Clearly, "[t]he framers of our Constitution, like those who drafted the Bill of Rights, anticipated that interpretation of the cruel or unusual punishments clause would not be static but that the clause would be applied consistently with the standards of the age in which the questioned punishment was sought to be inflicted." *People* v. *Anderson*, 6 Cal. 3d 628, 648, cert. denied, 406 U.S. 958 (1972). Therefore, if the death penalty is indeed unacceptable under contemporary moral stand-

ards, it is tantamount to those punishments barred since the adoption of art. 26, and it is our responsibility to declare it invalid.

It is true that there is no unanimity of public opinion either favoring or opposing the death penalty. But public opinion, while relevant, is not conclusive in assessing whether the death penalty is consonant with contemporary standards of decency. "If the judicial conclusion that a punishment is 'cruel and unusual' 'depend[ed] upon virtually unanimous condemnation of the penalty at issue,' then, '[l]ike no other constitutional provision, [the Clause's] only function would be to legitimize advances already made by the other departments and opinions already the conventional wisdom.' We know that the Framers did not envision 'so narrow a role for this basic guaranty of human rights.'" *Furman* v. *Georgia,* 408 U.S. 238, 268 (1972) (Brennan, J., concurring), quoting from Goldberg & Dershowitz, Declaring the Death Penalty Unconstitutional, 83 Harv. L. Rev. 1773, 1782 (1970).

Moreover, we think that what our society does in actuality is a much more compelling indicator of the acceptability of the death penalty than the responses citizens may give upon questioning. See *Furman* v. *Georgia,* 408 U.S. 238, 279 (1972) (Brennan, J., concurring). From the beginning of 1948 until the end of 1972 (the *Furman* case was decided in 1972) no person was executed in this Commonwealth. The death sentences of forty-three persons were commuted or reduced by executive action. See *Opinions of the Justices, supra* at 919, and sources cited. The complete absence of executions in the Commonwealth through these many years indicates that in the opinion of those several Governors and others who bore the responsibility for administering the death penalty provisions and who had the most immediate appreciation of the death sentence, it was unacceptable.

In its finality, the death penalty may cruelly frustrate justice. Death is the one punishment from which there can be no relief in light of later developments in the law or the

evidence. This court has recognized the anomalous results which may be wrought in criminal cases by changes in the law and has adjusted standards of appellate review accordingly. For example, in *Commonwealth* v. *Stokes,* 374 Mass. 583, 587-591 (1978), this court applied retroactively the constitutional requirement that the Commonwealth bear the burden of disproving self-defense,[8] and declined to apply the rule that challenged jury instructions are unreviewable absent contemporaneous objection or exception. We reasoned that defendants should not be penalized for failure to anticipate changes in the law. The "irreversible finality of the execution of a criminal defendant," *O'Neal II, supra* at 276 n.1 (Wilkins, J., concurring), could frustrate such efforts to see that justice is applied equally when changes in the law occur or when new evidence is discovered. While this court has the power to correct constitutional or other errors retroactively by ordering new trials for capital defendants whose appeals are pending or who have been fortunate enough to obtain stays of execution or commutations, it cannot, of course, raise the dead.

The cruelty of the death penalty similarly inheres in its unparalleled effect on all the rights of the person condemned. "There is little doubt that life is a fundamental right 'explicitly or implicitly guaranteed by the Constitution.' *San Antonio Independent Sch. Dist.* v. *Rodriguez,* 411 U.S. 1, 33-34 (1973). . . . [T]he ' . . . right to live . . . is the natural right of every man' (quoting from Camus, Reflections on the Guillotine, in Resistance, Rebellion and Death 131, 221 [1969]), encompassing as it does 'the right to have rights.' *Trop* v. *Dulles,* 356 U.S. 86, 102 (1958). See Comment, The Death Penalty Cases, 56 Cal. L. Rev. 1268, 1354 (1968)." *O'Neal II, supra* at 245-246 (Tauro, C.J., concurring). "The calculated killing of a human being by the state involves, by its very nature, a denial of the execut-

---

[8] See *Mullaney* v. *Wilbur,* 421 U.S. 684 (1975), made retroactive by *Hankerson* v. *North Carolina,* 432 U.S. 233 (1977), and by *Commonwealth* v. *Rodriguez,* 370 Mass. 684 (1976).

ed person's humanity. The contrast with the plight of a person punished by imprisonment is evident. An individual in prison does not lose 'the right to have rights.' A prisoner retains, for example, the constitutional rights to the free exercise of religion, to be free of cruel and unusual punishments, and to treatment as a 'person' for purposes of due process of law and the equal protection of the laws." *Furman* v. *Georgia,* 408 U.S. 238, 290 (1972) (Brennan, J., concurring).

Finally, and perhaps most conclusive, the death penalty is unacceptable under contemporary standards of decency in its unique and inherent capacity to inflict pain. The mental agony is, simply and beyond question, a horror. "Since the discontinuance of flogging as a constitutionally permissible punishment, *Jackson* v. *Bishop,* 404 F.2d 571 (CA 8 1968), death remains as the only punishment that may involve the conscious infliction of physical pain. In addition, we know that mental pain is an inseparable part of our practice of punishing criminals by death, for the prospect of pending execution exacts a frightful toll during the inevitable long wait between the imposition of sentence and the actual infliction of death." *Furman* v. *Georgia, supra* at 287-288 (Brennan, J., concurring). "[T]he process of carrying out a verdict of death is often so degrading and brutalizing to the human spirit as to constitute psychological torture," *People* v. *Anderson,* 6 Cal. 3d 628, 649, cert. denied, 406 U.S. 958 (1972), and "the onset of insanity while awaiting execution of a death sentence is not a rare phenomenon." *Solesbee* v. *Balkcom,* 339 U.S. 9, 14 (1950) (Frankfurter, J., dissenting).

The fact that the delay may be due to the defendant's insistence on exercising his appellate rights does not mitigate the severity of the impact on the condemned individual, and the right to pursue due process of law must not be set off against the right to be free from inhuman treatment. Moreover, it is often the very reluctance of society to impose the irrevocable sanction of death which mandates, "even against the wishes of the criminal, that all legal avenues be explored before the execution is finally carried out." *Fur-*

*man* v. *Georgia, supra* at 289 n.37 (Brennan, J., concurring). We conclude, therefore, from our examination of the actual operation of capital punishment provisions in Massachusetts, that the death penalty, with its full panoply of concomitant physical and mental tortures, is impermissibly cruel under art. 26 when judged by contemporary standards of decency.

## II.  THE DEATH PENALTY IS ARBITRARILY INFLICTED.

It is inevitable that the death penalty will be applied arbitrarily. Also, experience has shown that the death penalty will fall discriminatorily upon minorities, particularly blacks. For these reasons the death penalty is unconstitutionally cruel under art. 26 of the Declaration of Rights.[9]

We know that, each year during the decades of the 1930's through the 1960's, thousands of persons were convicted of criminal homicides in States where death was an authorized punishment for those crimes. However, death was inflicted in only a minute fraction of those cases. "When a country of over 200 million people inflicts an unusually severe punishment no more than 50 times a year, the inference is strong that the punishment is not being regularly and fairly applied. To dispel it would indeed require a clear showing of nonarbitrary infliction." *Furman* v. *Georgia,* 408 U.S. 238, 293 (1972) (Brennan, J., concurring). No rational basis can be offered to explain why the few were executed and many others were not. It cannot be said that only the "worst" offenders were executed. All murderers are extreme offenders. Fine distinctions, designed to select a very few from the many, are inescapably capricious when applied to murders and murderers. As a consequence, the

---

[9] It could also be said that such arbitrariness violates art. 1 of the Declaration of Rights of the Massachusetts Constitution, as amended by art. 106 of the Amendments, in its provision that all people must be treated with equality under the law, but we need not reach that argument, in light of our conclusions under art. 26.

death penalty is "wantonly and . . . freakishly" inflicted. *Furman* v. *Georgia, supra* at 310 (Stewart, J., concurring).

We think that arbitrariness in sentencing will continue even under the discipline of a post-*Furman* statute like the one before us. In 1972, in *Furman* v. *Georgia, supra,* the Supreme Court of the United States held that the Eighth Amendment (applied to the States through the Fourteenth) invalidated a Georgia statute which allowed the jury untrammeled discretion in choosing between death and life imprisonment as the penalty for the crime of murder. In July, 1976, the United States Supreme Court handed down a series of cases indicating that a majority of that Court are prepared, as far as the Federal Constitution is concerned, to validate State statutes which channel or regulate discretion in sentencing, thus curing those aspects of arbitrariness which concerned the Court in the *Furman* case. See *Gregg* v. *Georgia,* 428 U.S. 153 (1976); *Proffitt* v. *Florida,* 428 U.S. 242 (1976); *Jurek* v. *Texas,* 428 U.S. 262 (1976); *Woodson* v. *North Carolina,* 428 U.S. 280 (1976); *Roberts* v. *Louisiana,* 428 U.S. 325 (1976). "In summary, the concerns expressed in *Furman* that the penalty of death not be imposed in an arbitrary or capricious manner can be met by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance. As a general proposition these concerns are best met by a system that provides for a bifurcated proceeding at which the sentencing authority is apprised of the information relevant to the imposition of sentence and provided with standards to guide its use of the information." *Gregg* v. *Georgia,* 428 U.S. at 195 (Stewart, J.).

The Legislature of Massachusetts clearly attempted, in the statute now before us, to follow the mandates of the *Furman* opinion and its progeny by promulgating a law of guided and channeled jury discretion. It may be that c. 488 would meet the Federal constitutional requirements, if tested, but here we appraise the statute under art. 26 of the Declaration of Rights of the State Constitution. We accept the *Furman* principle that untrammeled discretion in im-

posing the death penalty is intolerable; we find unacceptable under the State Constitution the premise of the post-*Furman* cases that statutory guidelines and standards may be entirely curative. As Mr. Justice Harlan wrote in *McGautha* v. *California,* 402 U.S. 183, 204 (1971): "Those who have come to grips with the hard task of actually attempting to draft means of channeling capital sentencing discretion have confirmed the lesson taught by . . . history . . . . To identify before the fact those characteristics of criminal homicides and their perpetrators which call for the death penalty, and to express these characteristics in language which can be fairly understood and applied by the sentencing authority, appear to be tasks which are beyond present human ability."

A basic criterion, for example, in "channeling" the death penalty decision lies in the choice between first and second degree murder. Mr. Justice Cardozo said of the distinction between degrees of murder, that it is "so obscure that no jury hearing it for the first time can fairly be expected to assimilate and understand it. I am not at all sure that I understand it myself after trying to apply it for many years and after diligent study of what has been written in the books. Upon the basis of this fine distinction with its obscure and mystifying psychology, scores of men have gone to their death." Cardozo, What Medicine Can Do For Law, in Law & Literature 100-101 (1931).

Even if it were possible by statutory language to bring evenhandedness to the death penalty decisional process, we should still conclude that a statute (like c. 488) that presumably complies with the *Furman* principle is unconstitutional under art. 26. The Federal constitutional requirements are a constraint only upon certain aspects of jury discretion. *Furman* and subsequent cases do not address the discretionary powers exercised at other points in the criminal justice process. Power to decide rests not only in juries but in police officers, prosecutors, defense counsel, and trial judges.[10] In the totality of the process, most life or

---

[10] It is true also that executive clemency is exercised in the untrammeled discretion of the Governor and Executive Council, but we recognize that

death decisions will be made by these officials, unguided and uncurbed by statutory standards. In any given case, decisions may rest upon such considerations as the level of public outcry.

*Furman* stands indifferent to the exercise of the prosecutor's "untrammeled discretion." For reasons which may be valid in the context of his duties, but which do not assist evenhandedness, the prosecutor in a homicide case may forgo a first degree murder indictment and seek an indictment for second degree murder or a lesser charge. Also, in a first degree murder case, perhaps pursuant to plea bargaining, the prosecutor may in his uncurbed discretion nol-pros that part of the indictment which charges murder in the first degree. Similarly, the judge may dismiss the first degree murder charge, in his sole discretion, pursuant to accepting a plea of guilty to a lesser offense.

We do not think that our comments denigrate the general administration of criminal justice, or the good will of those who administer the system. It can be said that these officials must necessarily have these discretionary powers in the exercise of most of their functions. Nevertheless, the criminal justice system allows chance and caprice to continue to influence sentencing, and we are here dealing with the decisions as to who shall live and who shall die. With regard to the death penalty, such chance and caprice are unconstitutional under art. 26.

The death penalty has been described by many commentators not only as arbitrary and capricious but also as discriminatory. For example, the President's Commission on Law Enforcement and Administration of Justice concluded that "there is evidence that the imposition of the death sentence and the exercise of dispensing power by the courts and the executive follow discriminatory patterns. The death sentence is disproportionately imposed and car-

---

it can be said that there is a specific grant of such power. See Part II, c. 2, § 1, art. 8, of the Massachusetts Constitution, as amended by art. 73 of the Amendments.

ried out on the poor, the Negro, and the members of unpopular groups." The Challenge of Crime in a Free Society, A Report by the President's Commission on Law Enforcement and Administration of Justice 143 (1967). C. Black, Capital Punishment: The Inevitability of Caprice and Mistake (1974).

Examination of death sentences imposed in Florida, Georgia, and Texas under post-*Furman* statutes upheld by the Supreme Court in 1976 indicates that very little has changed as to arbitrariness and discrimination. The criminal homicide data from the date of the post-*Furman* statutes through 1977 indicate the following: In Florida, of 286 blacks who had killed whites, forty-eight (16.8%) were sentenced to death; of 111 whites who killed blacks, *none* were sentenced to death. In Georgia, of 258 blacks who killed whites, thirty-seven (14.3%) were sentenced to death; of seventy-one whites who killed blacks, two (2.8%) were sentenced to death. In Texas, of 344 blacks who killed whites, twenty-seven (7.8%) were sentenced to death; of 143 whites who killed blacks, *none* were sentenced to death.[11] One commentator stated as to this post-*Furman* experience, "The conclusion is inescapable that the death penalty is reserved for those who kill whites, because the criminal justice system in these states simply does not put the same value on the life of a black person as it does on the life of a white."[12] Another commentator concluded that

[11] W. Bowers & G. Pierce, Preliminary Tabulations Reflecting Arbitrariness and Discrimination under Post-*Furman* Capital Statutes, Table 1 (August 1979) (Center for Applied Social Research, Northeastern University). Data for this study were supplied (Florida, Georgia, and Ohio 1973-1976; Texas, 1974-1976) by the Uniform Crime Reporting Program of the United States Department of Justice and (1977) by various government and private organizations within each of the individual States. These figures are estimates compiled from the data identified above and are adjusted for temporal and cross sectional undercoverage. The adjustment procedures are described in Appendix A of the study.

[12] To Establish Rational Criteria For the Imposition of Capital Punishment: Hearings on S. 1382 Before the Subcommittee on Administrative Practice and Procedure of the Senate Judiciary Committee. 95th Cong., 2d Sess. 25 (1978) (statement of Dr. Hugo A. Bedau).

"there is no evidence to suggest that post-*Furman* statutes have been successful in reducing the discretion which leads to a disproportionate number of nonwhite offenders being sentenced to death."[13]

We reject any suggestion that racial discrimination is confined to the South or to any other geographical area. The experience of Ohio under a post-*Furman* statute through 1977 shows that, of 173 black persons who killed white persons, thirty-seven of them (21.4%) were sentenced to death. Of forty-seven whites who killed blacks, *none* were sentenced to death.[14] Moreover, the existence of racial prejudice in some persons in the Commonwealth of Massachusetts is a fact of which we take notice. Cf. *Commonwealth v. Soares*, 377 Mass. 461, cert. denied, 444 U.S. 881 (1979); *Commonwealth~v. Franklin*, 376 Mass. 885, 891-892 (1978).

From the foregoing discussion, it follows that we accept the wisdom of *Furman*, that arbitrary and capricious infliction of the death penalty is unconstitutional. However, we add that such arbitrariness and discrimination, which inevitably persist even under a statute which meets the demands of *Furman*, offend art. 26 of the Massachusetts Declaration of Rights.

We have a response to those who might argue that our comments as to arbitrariness and discrimination apply as well to all punishments, not merely to the death penalty. While other forms of punishment may also be arbitrary in some measure, the death penalty requires special scrutiny for constitutionality. "The penalty of death differs from all other forms of criminal punishment, not in degree but in kind." *Furman, supra* at 306 (Stewart, J., concurring). Accord, *O'Neal II*, 369 Mass. 242-249 (Tauro, C.J., concurring). "[T]he penalty of death is qualitatively different

---

[13] M. Reidel, Discrimination in the Imposition of the Death Penalty: A Comparision of the Characteristics of Offenders Sentenced Pre-Furman and Post-Furman, 49 Temple L.Q. 261, 282 (1976).

[14] W. Bowers & G. Pierce at Table 1, note 11, *supra*.

from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two." *Woodson* v. *North Carolina*, 428 U.S. 280, 305 (1976). Our society's failure to bring evenhandedness to the entire spectrum of criminal punishment calls for great and persistent effort toward improvement. However, we are not required to abandon all such punishments on constitutional grounds. At the same time, the supreme punishment of death, inflicted as it is by chance and caprice, may not stand.

III. CONCLUSION.

There is an impetus to respond in kind in punishing the person who has been convicted of murder, but the death penalty brutalizes the State which condemns and kills its prisoners. "Revenge is a kind of wild justice; which the more man's nature runs to, the more ought law to weed it out."[15] Moreover, this brutality assumes new dimensions in its virtually random selection of those who are to be executed. "I shall ask for the abolition of the punishment of death until I have the infallibility of human judgment demonstrated to me."[16]

A judgment shall enter in the county court declaring that c. 488 of the Acts of 1979 is unconstitutional under art. 26 of the Declaration of Rights of the Constitution of Massachusetts.

*So ordered.*

BRAUCHER, J. (concurring). I join in the opinion and decision of the court, but I cannot rid myself of doubt whether, if

___

[15] Of Revenge, The Works of Francis Bacon 384 (J. Spedding ed. 1858).

[16] Words of Thomas Jefferson as quoted by Senator Hart, A Bill to Abolish the Death Penalty Under all Laws of the United States: Hearings on S. 1760 Before the Subcomm. on Criminal Laws and Procedures of the Senate Committee on the Judiciary, 90th Cong., 2d Sess. 14 (1968).

I relied solely on "contemporary standards of decency," "I would be enforcing my private view rather than that consensus of society's opinion which . . . is the standard enjoined by the Constitution." *Louisiana ex rel. Francis* v. *Resweber*, 329 U.S. 459, 471 (1947) (concurring opinion of Frankfurter, J.). Not only is there profound disagreement on the question whether the death penalty should ever be imposed; there is also disagreement among those who favor the death penalty as to what circumstances make it appropriate. But those disagreements reinforce the court's second ground of decision. In our criminal justice system responsibility for answering those questions is so diffused that the answers inevitably will be inconsistent, like cases will not be treated alike, and the penalty will be arbitrarily inflicted. Even if the judicial branch could administer the death penalty fairly and with reasonable certainty and expedition, neither we nor the Legislature could control either executive clemency or Federal intervention.

I find particularly persuasive the recent course of events. In the four years since the decision in *Gregg* v. *Georgia*, 428 U.S. 153 (1976), "hundreds have been placed on death row" but "only three persons have been executed." *Godfrey* v. *Georgia*, 446 U.S. 420, 439 at nn.8, 9 (1980) (concurring opinion of Marshall, s.). Even in the rare case where the sentence has been carried out, it has been carried out only after "one or more agonizing stays of execution." *Lenhard* v. *Wolff*, 444 U.S. 807, 811 n.2 (1979) (dissenting opinion of Marshall, J.). The threat of death constitutes punishment in itself. Cf. *Gilmore* v. *Utah*, 429 U.S. 1012, 1013 n. 1 (1976) (concurring opinion of Burger, C.J.) (defendant's only complaint was with respect to the delay in carrying out the sentence). It is not suggested that punishment by threat serves a useful purpose if the threat is never carried out; its utility must rest instead on the utility of the threatened execution. Punishment is cruel when it involves "a lingering death." *In re Kemmler*, 136 U.S. 436, 447 (1890). See *Louisiana ex rel. Francis* v. *Resweber*, 329 U.S. 459, 463-464 n.4 (1947). Since death sentences will rarely be

carried out, and since they will be carried out only after agonizing months and years of uncertainty, the punishment is cruel and unusual and violates art. 26 of the Declaration of Rights.

WILKINS, J. (concurring). I alone among my colleagues believe that this court, in its discretion, should not pass on the constitutionality of the capital punishment statute in this proceeding. However, because all my colleagues have expressed their views on the constitutionality of the statute, I think it appropriate that I also do so in this matter of great public importance. Thus, I join in the opinion of the court.

I would have preferred to decide this constitutional question in an actual case in which the question had to be answered. Such a case would have been one in which, after conviction of murder in the first degree, the jury unanimously recommended the imposition of the death penalty and, on appeal, apart from the possible unconstitutionality of the capital punishment statute, the conviction would have been affirmed after consideration of all other grounds of the appeal, including the exercise of our special power and duty under G. L. c. 278, § 33E, to review the record to see that justice was done and that there was no reason for reducing the verdict.[1]

The district attorney for the Suffolk district has no such dilemma that he needs an answer to the question. He is but one of the district attorneys in the Commonwealth. Others have not seen fit to participate in the case, although they had an opportunity to do so. Indeed, a trial has already been held in Norfolk County under the new statute. The Attorney General, the chief law enforcement officer in the Commonwealth, argues that we should not, by answering

---

[1] Our consideration might also have resulted in a determination that, even assuming the death penalty statute were constitutional, under the terms of the statute (G. L. c. 279, § 56 [c]) the sentence of death nevertheless should not have been imposed.

the constitutional question, in effect give an "advisory" opinion.[2]

If the statute's procedures were followed and this court ultimately were to declare the statute unconstitutional, there would be no disruption of the system. The sentence of death would be vacated, and the defendant resentenced to life imprisonment. This is exactly what happened in numerous cases following the Supreme Court's decision in *Furman* v. *Georgia,* 408 U.S. 238 (1972). See *Commonwealth* v. *Curry,* 368 Mass. 195, 204 (1975); *Commonwealth* v. *Stone,* 366 Mass. 506, 518 (1974), and cases cited.

The court's approach to these questions presents a constitutional confrontation between its views and those of the Legislature. I would have preferred not to identify such a conflict unless and until the circumstances of a particular case made it unavoidable.[3]

___

[2] The Attorney General has not, however, exercised whatever authority he might have to control the maintenance of this proceeding by the plaintiff. See G. L. c. 12, § 27 ("but the attorney general, when present, shall have the control of such case," i.e., "cases, criminal or civil, in which the commonwealth is a party or interested"). See also *Commonwealth* v. *Kozlowsky,* 238 Mass. 379, 389-390 (1921).

The Justices of this court have a constitutional duty to give advisory opinions on important questions of law on solemn occasions on the request of the House, the Senate, the Governor, or the Executive Council. Part II, c. 3, art. 2, of the Constitution of the Commonwealth, as amended by art. 85 of the Amendments. Neither branch of the Legislature asked for an advisory opinion from the Justices concerning the new death penalty statute. The judgment of each branch of the Legislature not to seek such an opinion suggests their preference that the death penalty statute be tested in a real, and not a hypothetical, proceeding.

[3] Unlike the practice under the former procedure in which the penalty of death would be imposed unless the jury unanimously recommended against it (*Commonwealth* v. *Stewart,* 359 Mass. 671, 676 [1971], judgment vacated, 408 U.S. 845 [1972]), the new capital punishment statute calls for a sentence of death only if all twelve jurors recommend it. G. L. c. 279 § 55. It is a violation of the Fourteenth Amendment to the Constitution of the United States to exclude potential jurors "simply because they [voice] general objections to the death penalty or [express] conscientious or religious scruples against its infliction." *Witherspoon* v. *Illinois,* 391 U.S. 510, 522 (1968). One may speculate that, if the statute were allowed to operate, a case involving the imposition of the death penalty might not reach this court for some time.

LIACOS, J. (concurring). Mr. Justice Brennan, concurring in *Furman* v. *Georgia,* 408 U.S. 238, 257 (1972), reviewed the four principles recognized in earlier cases and inherent in the prohibition against cruel and unusual punishment found in the Eighth Amendment to the Federal Constitution. The first principle "is that a punishment must not be so severe as to be degrading to the dignity of human beings." *Id.* at 271. The second principle is that "the State must not arbitrarily inflict a severe punishment." *Id.* at 274. A "third principle inherent in the [Eighth Amendment] is that a severe punishment must not be unacceptable to contemporary society." *Id.* at 277. Finally, inherent in the Eighth Amendment prohibition is the principle that "a severe punishment must not be excessive." *Id.* at 279. Mr. Justice Brennan recognized, as do I, that these principles are interrelated and cumulative. "The function of these principles, after all, is simply to provide means by which a court can determine whether a challenged punishment comports with human dignity." *Id.* at 282.

While the language of the Eighth Amendment ("nor cruel and unusual punishments inflicted") and art. 26 ("[n]o magistrate or court of law, shall . . . inflict cruel or unusual punishments") is not identical, our decisions have utilized Federal precedent in interpreting our own constitutional provisions. *Commonwealth* v. *O'Neal,* 369 Mass. 242, 244 n.1 (1975) (*O'Neal II*) (Tauro, C.J., concurring). The discussion in *O'Neal II, supra,* the *Opinions of the Justices,* 372 Mass. 912 (1977), and the opinion of the majority in this case proceeds in essence within the framework of the principles summarized by Mr. Justice Brennan in *Furman.*[1] While I do not disagree with this approach, it is also likely that the Constitution of this Commonwealth may have a separate and distinct meaning which is to be interpreted

---

[1] Chief Justice Tauro also based his views in *O'Neal II* on due process considerations. Even this approach is not without precedent in the earlier Federal decisions. See, e.g., *Louisiana ex rel. Francis* v. *Resweber,* 329 U.S. 459 (1947).

and enforced by this court. See, e.g., *Commonwealth* v. *Soares,* 377 Mass. 461, cert. denied, 444 U.S. 881 (1979). Article 26, with its disjunctive phrasing, has been so interpreted by the Attorney General of this Commonwealth. See Note, The Death Penalty in Massachusetts, 8 Suffolk U.L. Rev. 632, 646 (1974). The California Supreme Court has similarly interpreted its constitutional provision containing essentially the same language as art. 26. *People* v. *Anderson,* 6 Cal. 3d 628, cert. denied, 406 U.S. 958 (1972). This court has not decided whether the phrase "cruel and unusual" and the phrase "cruel or unusual" have the same or a distinct meaning. But cf. *O'Neal II, supra* at 247 n.4 (Tauro, C.J., concurring). The majority opinion does not reach this issue. While I concur in the reasoning and result of the majority, I would go further and state that art. 26 stands on its own footing, for reasons similar to those expressed in *Anderson, supra.* I would further hold that a punishment may not be inflicted if it be either "cruel" or "unusual." Last, in my view, the imposition of death by the State as a penalty for crime "is in itself so brutal to the object and so dehumanizing of others that it constitutes 'cruel' or 'unusual' punishment within art. 26." *Opinions of the Justices, supra* at 921.

I write to amplify my reasons for joining in the conclusion of the court that "the death penalty, with its full panoply of concomitant physical and mental tortures, is impermissibly cruel under art. 26 when judged by contemporary standards of decency." See *supra* at 665.

The imposition of the death penalty is disguised by the language and technique of abstraction. "Indeed, no one dares speak directly of the ceremony. Officials and journalists who have to talk about it, as if they were aware of both its provocative and its shameful aspects, have made up a sort of ritual language, reduced to stereotyped phrases. Hence we read at breakfast time in a corner of the newspaper that the condemned 'has paid his debt to society' or that he has 'atoned' or that 'at five a.m. justice was done.'" A. Camus, Reflections on the Guillotine, in Resistance,

Rebellion, and Death 132 (1960). Consistent with the views of Camus, of authorities cited elsewhere in this opinion, and of the majority, are the experiences described by Henry Arsenault, a convicted murderer sentenced to death in this Commonwealth. See *Arsenault* v. *Commonwealth,* 353 Mass. 575, rev'd 393 U.S. 5 (1968). See also *Commonwealth* v. *Devlin,* 335 Mass. 555 (1957). Arsenault is presently an inmate at the Massachusetts Correctional Institution at Norfolk and has submitted a brief pro se as amicus curiae. His brief tells his story.

For over two years, Henry Arsenault "lived on death row feeling as if the Court's sentence were slowly being carried out." Arsenault could not stop thinking about death. Despite several stays, he never believed he could escape execution. "There was a day to day choking, tremulous fear that quickly became suffocating." If he slept at all, fear of death snapped him awake sweating. His throat was clenched so tight he often could not eat. His belly cramped, and he could not move his bowels. He urinated uncontrollably. He could not keep still. And all the while a guard watched him, so he would not commit suicide. The guard was there when he had his nightmares and there when he wet his pants. Arsenault retained neither privacy nor dignity. Apart from the guards he was alone much of the time as the day of his execution neared.

And on the day of the execution, after three sleepless weeks and five days' inability to eat, after a night's pacing the cell, he heard the warden explain the policy of the Commonwealth — no visitors,[2] no special last meal, and no medication. Arsenault asked the warden to let him walk to the execution on his own. The time came. He walked to the death chamber and turned toward the chair. Stopping him, the warden explained that the execution would not be for over an hour. Arsenault sat on the other side of the room as the witnesses filed in behind a one-way mirror.

---

[2] Only members of the prisoner's immediate family were allowed to visit before the execution. Arsenault had no immediate family.

When the executioner tested the chair, the lights dimmed. Arsenault heard other prisoners scream. After the chaplain gave him last rites, Arsenault heard the door slam shut and the noise echoing, the clock ticking. He wet his pants. Less than half an hour before the execution, the Lieutenant Governor commuted his sentence. Arsenault's legs would not hold him up. Guards carried him back to his cell. He was trembling uncontrollably. A doctor sedated him. And he was moved off death row.

"That capital punishment is horrible and cruel is the reason for its existence." C. Darrow, A Comment on Capital Punishment, quoted in Attorneys for the NAACP Legal Defense and Educational Fund, A Cruel and Unusual Punishment, in Voices Against Death, 264, 283 (P. Mackey ed. 1976). The raw terror and unabating stress that Henry Arsenault experienced was torture; torture in the guise of civilized business in an advanced and humane polity. This torture was not unique, but merely one degrading instance in a legacy of degradation.[3] The ordeals of the condemned are inherent and inevitable in any system that informs the condemned person of his sentence[4] and provides for a gap between sentence and execution.[5] Whatever one believes

---

[3] Many commentators have recognized the debilitating effects of imprisonment under sentence of death. See, e.g., *Furman* v. *Georgia*, 408 U.S. 238, 288-289 n.36 (1972) (Brennan, J., concurring). See also *Commonwealth* v. *O'Neal*, 369 Mass. 242, 249-250 (1975) (*O'Neal II*) (Tauro, C.J., concurring); *People* v. *Anderson*, 6 Cal. 3d 628, 649, cert. denied, 406 U.S. 958 (1972).

[4] I am assuming that the condemned prisoner has sufficient mental competence between the time of sentence and execution to understand what the State is doing to him.

[5] At the end of the 1960's, the average time spent on death row was 32.6 months. H. Bedau, The Courts, the Constitution, and Capital Punishment 60 (1977). "[H]uman reaction to the threat of death is a function of the duration, as well as the nature of the threat." Note, Mental Suffering Under Sentence of Death: A Cruel and Unusual Punishment, 57 Iowa L. Rev. 814, 830 (1972). Lengthy delays, especially if punctuated by a series of last minute reprieves, intensify the prisoner's suffering. West, Psychiatric Reflections on the Death Penalty, in Voices Against Death 290, 291 (P. Mackey ed. 1976). Nonetheless, one psychiatric study of a limited sample found that, for two to three months, the typical con-

about the cruelty of the death penalty itself, this violence done the prisoner's mind must afflict the conscience of enlightened government and give the civilized heart no rest.[6]

Death is the "king of terrors." *Job* 18:14. Aristotle called death "the most terrible of all things; for it is the end, and nothing is thought to be any longer either good or bad for the dead." Aristotle, Nicomachean Ethics, Book III, c. 6, 64 (D. Ross trans. 1969). Fear of death is natural[7] and

---

demned prisoner felt he was going to break down; within six to eighteen months, according to the researchers, most inmates had adjusted somewhat to their lot. Gallenore & Parton, Inmate Responses to Lengthy Death Row Confinement, 129 Am. J. of Psychiatry 167 (1972). My argument that the ordeal imposed on the condemned is cruel and unusual punishment does not depend on the existence of lengthy delays between sentence and execution. Two months — or for that matter one day — of torture offends the Constitution. As C. Duffy, a former warden of California's prison at San Quentin, has described, "One night on death row is too long, and the length of time spent there by [some inmates] constitutes cruelty that defies the imagination. It has always been a source of wonder to me that they didn't all go stark, raving mad." C. Duffy & A. Hirshberg, 88 Men and 2 Women 254 (1962).

[6] Cf. *In re Kemmler*, 136 U.S. 436, 447 (1890) ("[T]he punishment of death is not cruel, within the meaning of [the Eighth Amendment]. It implies there something inhuman and barbarous, something more than the mere extinguishment of life"). Most Federal precedent relating to the death penalty has demonstrated insensitivity to the mental anguish of the condemned. See *Louisiana ex rel. Francis* v. *Resweber*, 329 U.S. 459, 464 (1947) (plurality opinion), cited with approval in *Gregg* v. *Georgia*, 428 U.S. 153, 178 (1976) (plurality opinion): "The cruelty against which the Constitution protects a convicted man is cruelty inherent in the method of punishment, not the necessary suffering involved in any method employed to extinguish life humanely." But see *Furman* v. *Georgia*, 408 U.S. 238, 288-289 (1972) (Brennan, J., concurring); cf. *Trop* v. *Dulles*, 356 U.S. 86, 101 (1958) (Eighth Amendment protection not limited to physical mistreatment). For a discussion of the issue under art. 26 of our State Constitution, see *O'Neal II*, 369 Mass. 242, 249-250 (1975) (Tauro, C.J., concurring). See also *id.* at 282-283 (Braucher, J., concurring in the result).

[7] See, e.g., F. Bacon, Of Death, in The Oxford Anthology of English Literature 1437-1438 (F. Kermode & J. Hollander, gen. eds. 1973). Bacon goes on to say that any emotion can overwhelm the fear of death, *id.*, but this shows only that the mind is not static. It is constantly in motion. Furthermore, the fear of death takes many covert forms. See generally E. Becker, The Denial of Death (1973).

universal in human experience.[8]  It resides in our inability to imagine our own nonexistence.[9]  We imagine the manner of death and the corpse[10] or, perhaps in hopes of finding consolation, we envision the continuing life of the soul.[11]  So deep is the fear of death and the corresponding desire for transcendence that Christian thought attributes death to the fall of Adam,[12] and the New Testament proclaims Christ's victory over death. 1 *Corinthians* 15:20, 26.

Psychiatrists have observed that terror of death is at the root of much mental disease. "The anxiety neuroses, the various phobic states, even a considerable number of depressive suicidal states and many schizophrenias amply demonstrate the ever-present fear of death which becomes woven into the major conflicts of the given psychopathological conditions." Zilboorg, Fear of Death, 12 Psychoanalytic Q. 465, 465-467 (1943), quoted in E. Becker, The Denial of Death 16 (1973).  See also Lifton, The Sense of Immor-

---

[8] Aristotle, Nicomachean Ethics, Book III, c. 7, 65 (D. Ross trans. 1969) ("What is terrible is not the same for all men; but we say there are things terrible even beyond human strength.  These, then, are terrible to every one . . .").

[9] I. Kant, Anthropology from a Pragmatic Point of View § 27 (1978).

[10]   "Ay, but to die, and go we know not where;
To lie in cold obstruction and to rot;
This sensible warm motion to become
A kneaded clod; and the delighted spirit
To bathe in fiery floods, or to reside
In thrilling region of thick-ribbed ice;
To be imprison'd in the viewless winds,
And blown with restless violence round about
The pendent world . . . ."

W. Shakespeare, Measure for Measure, Act III, Scene i.

[11] Such thoughts, of course, are not invariably comforting:

"[T]he dread of something after death —
The undiscover'd country from whose bourn
No traveller returns . . . ."

W. Shakespeare, Hamlet, Act III, Scene i.  See generally J. Choron, Death and Western Thought (1963).

[12] See, e.g., J. Milton, Paradise Lost, Book I, Lines 2-3.

tality: On Death and the Continuity of Life, in New Meanings of Death 274 (H. Feifel ed. 1977). We instinctively hold to life.

> "The weariest and most loathed worldly life
> That age, ache, penury and imprisonment
> Can lay on nature is a paradise
> To what we fear of death."[13]

The condemned must confront this primal terror directly, and in the most demeaning circumstances. A condemned man knows, subject to the possibility of successful appeal or commutation, the time and manner of his death. His thoughts about death must necessarily be focused more precisely than other people's. He must wait for a specific death, not merely expect death in the abstract.[14] Apart from cases of suicide or terminal illness, this certainty is unique to those who are sentenced to death. The State puts the question of death to the condemned person, and he must grapple with it without the consolation that he will die naturally[15] or with his humanity intact.[16] A condemned person experiences an extreme form of debasement.

---

[13] W. Shakespeare, Measure for Measure, Act III, Scene i.

[14] See J.P. Sartre, Being and Nothingness 685-687 (Barnes ed. 1969).

[15] For five hundred years, in various manifestations, the ideal of natural death has prevailed in Western society. See I. Illich, Political Uses of Natural Death, in The Hastings Center Report, Death Inside Out 25, 29-42 (P. Steinfels & R. Veatch, eds. 1975). In the Eighteenth Century, Condorcet stated the ideal plainly. See J. Choron, supra at 135-136. The notion that death is natural, a part of life, even the "final stage of growth," underlies Dr. Elisabeth Kübler-Ross's approach to helping terminally ill patients adjust to approaching death. Death: The Final State of Growth (E. Kübler-Ross ed. 1975). E. Kübler-Ross, On Death and Dying 5-6 (1969). If he achieves the last stage of the psychological process of dying, the patient comes to accept his death as a natural event in his life. See E. Kübler-Ross, On Death and Dying c. 7 (1969). It seems unlikely that a condemned prisoner could arrive at the same attitude of acceptance.

[16] The circumstances of a person's death profoundly affect the experience. Montaigne believed that the cause of a dying person's fear of death is the fear in the faces of those attending him. M. de Montaigne, Essays, I:20, 67-68 (D.M. Frame, trans. 1958). Kübler-Ross asserts that

A sociologist has identified the ideal characteristics of the modern "humane" practice of capital punishment. The treatment of the condemned and the execution itself can be described as "stark, impersonal, solemn, unemotional, privatized,"[17] unlike the raucous spectacles of earlier times.[18] Not all recent executions accomplish these objectives. Indeed, grotesque descriptions of electrocutions, both bungled and successful,[19] indicate that the method presently used falls far short of its goal. Cf. *Furman* v. *Georgia, supra* at 287 (Brennan, J., concurring) ("[I]t appears that there is no method available that guarantees an immediate and painless death"). Shortcomings aside, how-

---

death is easiest to cope with in a familiar environment. E. Kübler-Ross, Questions and Answers on Death and Dying, c. 6 (1974). See generally P. Aries, Western Attitudes Toward DEATH: From the Middle Ages to the Present (1974). See also Mauksch, The Organizational Context and Dying, in Death: The Final State of Growth 7 (E. Kübler-Ross ed. 1975).

[17] Lofland, The Dramaturgy of State Executions, in State Executions Viewed Historically and Sociologically 275, 319 (1977) (hereinafter Lofland). As Lofland points out, these are features of many modern ways of dying. See P. Aries, Western Attitudes Toward DEATH: From the Middle Ages to the Present, c. 4 (1974).

[18] See, e.g., D. Cooper, The Lesson of the Scaffold (1974); M. Foucault, Discipline and Punish, Part 1, c. 2 (1979). Public spectacles, complete with execution sermons of the clergy and speeches of the condemned, were the practice in early Massachusetts. E. Powers, Crime and Punishment in Early Massachusetts 1620-1692, 294-298 (1966). Powers also documents in part the movement favoring "humane" capital punishment in Massachusetts in the Nineteenth Century. *Id.* at 310-320.

[19] See, e.g., *Louisiana ex rel. Francis* v. *Resweber, supra* at 480-481 n.2 (Burton, J., dissenting); Bills to Suspend for Two Years or to Abolish the Death Penalty: Hearings on H.R. 8414, H.R. 8483, H.R. 9486; H.R. 3243, H.R. 193, H.R. 11797; and H.R. 12217 Before Subcommittee No. 3 of the House Committee on the Judiciary, 92d Cong., 2d Sess. 305-306 (1972); A Bill to Abolish the Death Penalty Under All Laws of the United States: Hearings on S. 1760 Before the Subcommittee on Criminal Laws and Procedures of the Senate Committee on the Judiciary, 90th Cong., 2d Sess. 20-21 (1968) (hereinafter Senate Hearings) (testimony of Clinton T. Duffy); Lofland, *supra* at 314-315; G.R. Scott, The History of Capital Punishment 216-220 (1950); Comment, The Death Penalty Cases, 56 Cal. L. Rev. 1268, 1338-1339 (1968). But see *In re Kemmler*, 136 U.S. 436, 443-444, 447 (1890) (relying on lower court finding that death by electrocution is instantaneous and painless).

ever, the result of this attempt at "humane" execution is to go far toward concealing the fact and significance of the event: that a human being has been put to death. Thus, writers have remarked on the anomaly of hiding from the public a practice ostensibly designed to deter crime.[20]

Less frequently observed is the effect of these policies upon the condemned. The death sentence itself is a declaration that society deems the prisoner a nullity, less than human and unworthy to live. But that negation of his personality carries through the entire period between sentence and execution. "[I]n Death Row, organized and controlled in grim caricature of a laboratory, the condemned prisoner's personality is subjected to incredible stress for prolonged periods of time."[21] The condemned person is generally isolated, allowed few visitors, limited in permissible activities, and kept under close guard.[22] The execution occurs within prison walls in a small room before witnesses whom the prisoner may not be able to see. The prisoner wears prison clothes. He is allowed to say little, if anything, and is often blindfolded. An anonymous executioner puts him to death at an odd hour. The mode of execution ideally causes little commotion to inform the witnesses that a person has died. And the body is not displayed. In this context, the prisoner has only the most meager opportunities to assert his shattered dignity, and few persons ever see any gesture he chooses to make.[23]

---

[20] Senate Hearings, *supra* at 31 (testimony of James Bennett). *Id.* at 40-42 (testimony of Douglas Lyons). A. Camus, Reflections on the Guillotine, in Resistance, Rebellion, and Death 135-142 (1960). W.C. Bok, Star Wormwood, quoted in Gottlieb, Capital Punishment, 15 Crime & Delinquency 1, 7-8 (1969).

[21] West, Psychiatric Reflections on the Death Penalty, in Voices Against Death 290-291 (P. Mackey ed. 1976).

[22] See, e.g., R.A. Liston, The Edge of Madness 104 (1972); Lofland, *supra* at 320; Smith, Count Down for Death, 15 Crime & Delinquency 77 (1969).

[23] See Lofland, *supra* at 320-321. Mythology and history are replete with the instances of honorable death. Saints, martyrs, heroes, and patriots have met death not only with pride and courage, but even with joy. Seneca has stated: "Death is sometimes a punishment, sometimes a gift;

Under the circumstances it is virtually impossible to die a noble or courageous or self-respecting death.[24]

"[W]hat man experiences at such times," Camus wrote, "is beyond all morality . . . . Having to face an inevitable death, any man, whatever his convictions, is torn asunder from head to toe. The feeling of powerlessness and solitude of the condemned man, bound up and against the public coalition that demands his death, is in itself an unimaginable punishment . . . . [I]t would be better for the execution to be public. The actor in every man could then come to the aid of the terrified animal and help him cut a figure, even in his own eyes. But darkness and secrecy offer no recourse. In such a disaster, courage, strength of soul, even faith may be disadvantages. As a general rule, a man is undone by waiting for capital punishment well before he dies. Two deaths are inflicted on him, the first being worst than the second, whereas he killed but once. Compared to such torture, the penalty of retaliation seems like a civilized law" (footnote omitted). A. Camus, *supra* at 155-156.[25]

---

to many it has come as a favor." Seneca, Hercules Oetaeus, quoted in Evans' Dictionary of Quotations 149 (1968). Whether one is a coward or courageous, modern methods of execution produce no martyrs or patriots. The romantic notions of heroic death are precluded by the realities of modern "humane" methods of execution.

[24] Contrast the death of Socrates, who died for an idea after conversation with an audience of friends and disciples, at a time of his choosing, and out of sight of officials other than the man who prepared the hemlock. See Plato, Phaedo, in Plato: The Collected Dialogues 40, especially 41-43 and 95-98 (E. Hamilton & H. Cairns, eds. 1961).

[25] See Black, The Crisis in Capital Punishment, 31 Md. L. Rev. 289, 292 (1971): "What cannot be changed, apart from the killing itself, is the fear. To say the literal truth about this fear, and about its grosser physiological consequences, even in restrained language, is to incur the charge of sensationalism. This is the standard fatigued old charge which must always be borne by the opponents of cruelty in any form. . . . But I solemnly assert that those who are still in doubt owe it to their own consciences to think often . . . on what it does to a human being to be classified as a piece of trash, fit only to be disposed of, and then to be given a while, in close confinement but under close observation, to think about the impending disposition. . . . [I]f anything at all is evil, then I submit that the imposition of this fear, with its consequences, is in itself an evil of a size too big for language, an evil sternly demanding the clearest and most weighty justification."

The condemned suffer a "fate of ever-increasing fear and distress," *Trop* v. *Dulles*, 356 U.S. 86, 102 (1958), quoted in *Furman* v. *Georgia, supra* at 289 (Brennan, J., concurring), which result in "behavioral aberrations ranging from malingering to acute psychotic breaks."[26] Thus, "the onset of insanity while awaiting execution of a death sentence is not a rare phenomenon."[27] *Solesbee* v. *Balkcom*, 339 U.S. 9, 14 (1950) (Frankfurter, J., dissenting).

The purpose of the cruel or unusual punishment prohibition is to guarantee a measure of human dignity even to the wrongdoers of our society. The Massachusetts Constitution recognizes that there are some punishments so abhorrent, so offensive to evolved standards of decency, that no justification can support their employment. Inflicting upon a person the terror of death in a definite manner is such a punishment. My views would not change if stays on death row were made more pleasant, killing techniques less painful, or removal from death row more swift. This is a punishment antithetical to the spiritual freedom that underlies the democratic mind. What dignity can remain for the government that countenances its use?

Fyodor Dostoyevsky was sentenced to die for discussing Utopian Socialist ideas. Arrayed with his coprisoners, he saw three men bound to stakes and blindfolded before the firing squad. Just as the commanding officer was about to shout "Fire!" an official waved his white handkerchief to stop the execution and inform them that the Czar had commuted the men's sentences. "Standing before the firing squad he was so certain of the imminence of death that he felt more dead than alive at the abrupt proclamation of the Czar's clemency; when he finally recovered his senses it was

---

[26] West, *supra* at 292. For brief case histories showing inmate reaction to the death sentence, see, e.g., Bluestone & McGahee, Reaction to Extreme Stress: Impending Death by Execution, 119 Am. J. of Psychiatry 393 (1962); Gottlieb, *supra* at 8-10.

[27] When a condemned prisoner does become insane, the psychiatrist faces the task of restoring him to sanity so the execution can take place. West, *supra* at 292. Gottlieb, *supra* at 10.

to find himself in irons and on his way to Siberia. There he
. . . had to submit to treatment so inhuman that only
glimpses of it can be caught in his later work . . . ."[28] Thus,
Dostoyevsky wrote from experience when he discussed the
fate of the condemned. In The Idiot, Prince Myshkin hears
the suggestion that the guillotine is painless. He contends
that a painless execution may be harder for the condemned
than torture. "[T]he chief and the worst pain is perhaps not
inflicted by wounds, but by your certain knowledge that in
an hour, in ten minutes, in half a minute, now, this moment
your soul will fly out of your body, and that you will be a
human being no longer, and that that's certain — the main
thing is that it is *certain*. Just when you lay your head
under the knife and you hear the swish of the knife as it
slides down over your head — it is just that fraction of a sec-
ond that is the most awful of all . . . . To kill for murder is
an immeasurably greater evil than the crime itself . . . .
[H]ere all . . . last hope, which makes it ten times easier to
die, is taken away *for certain*; here you have been sentenced
to death, and the whole terrible agony lies in the fact that
you will most certainly not escape, and there is no agony
greater than that. Take a soldier and put him in front of a
cannon in battle and fire at him and he will still hope, but
read the same soldier his death sentence *for certain*, and he
will go mad or burst out crying. Who says that human
nature is capable of bearing this without madness? Why this
cruel, hideous, unnecessary, and useless mockery? . . . It
was of agony like this and of such horror that Christ spoke.
No, you can't treat a man like that!"[29]


QUIRICO, J. (dissenting). I dissent from the holding of the
court that St. 1979, c. 488, entitled "An Act providing for
capital punishment," and that the various amendments to

---

[28] M. Slonim, Introduction to F. Dostoyevsky, The Brothers Karamazov
at v, v-vi (C. Garnett trans. 1950).

[29] F. Dostoyevsky, The Idiot 47-48 (D. Magarshack trans. 1955).

the General Laws enacted thereby are unconstitutional under art. 26 of the Declaration of Rights of the Constitution of the Commonwealth. Although the holding is directed to specific statutory enactments, I believe that it is fair to state (1) that the broad sweep of the language of the court leaves the Legislature without power to enact legislation authorizing the imposition of the death penalty for any crime, and (2) that this situation will prevail unless and until (a) the present decision is reversed by this court, or (b) our Constitution is amended to negative or otherwise reverse the effect of this decision by the addition of language which recognizes or declares that the Legislature has the power to enact such legislation.

Today's decision completes a cycle which this court started by its decision in *Commonwealth* v. *O'Neal*, 369 Mass. 242 (1975), where four Justices held, although not all for the same reasons, that the Massachusetts Constitution proscribed the death penalty for the crime of rape-murder. Three of those Justices expressed the view that some cases of murder in the first degree might constitutionally be made subject to the death penalty. *Id.* at 263-264 n.23 (Tauro, C.J., concurring). *Id.* at 275 (Hennessey, J., concurring). *Id.* at 277-278 (Wilkins, J., concurring). I joined the dissent by Justice Reardon in the *O'Neal* case. *Id.* at 283. On the same day the rule of the *O'Neal* case was applied in deciding *Commonwealth* v. *Tarver*, 369 Mass. 302 (1975). I dissented in that case. *Id.* at 320.

The next occasion on which the Justices of this court were called to speak on the subject of the constitutionality of capital punishment under our State Constitution was in *Opinions of the Justices*, 372 Mass. 912 (1977). Five of the Justices joined in an opinion that a bill on the subject of capital punishment then under consideration by the House of Representatives would violate art. 26 of the Declaration of Rights. Justice Braucher and I joined in an opinion to the contrary. *Id.* at 922.

The grounds or bases on which the majority or plurality of the Justices based their decisions or opinions on the un-

constitutionality of the death penalty in this Commonwealth may be summarized as follows. In *Commonwealth* v. *O'Neal, supra,* in which all members of the court participated, a majority concurred in the view that because the Commonwealth had failed to establish that the death penalty for rape-murder served a compelling or substantial State interest, the punishment violated art. 26 of the Declaration of Rights.[1]  The *Opinions of the Justices, supra,* were given in response to a question whether the bill then being considered would, if enacted, violate arts. 1, 10, 12 or 26 of the Declaration of Rights of the Massachusetts Constitution. Five of the Justices joined in an opinion that the bill, if enacted, would violate art. 26, and they did not answer as to arts. 1, 10, and 12.

In the present case six of the Justices subscribe to the conclusion that the death penalty violates art. 26 of the Declaration of Rights.  Five of those Justices base their decision on two grounds:  that the actual operation of capital punishment in Massachusetts, with its concomitant physical and mental torture, violates contemporary standards of decency; and that the discretionary powers exercised throughout the criminal process make the death penalty both arbitrary and discriminatory.[2]  One of those five Justices concurs in a separate opinion which places greater emphasis and reliance on the ordeal of the condemned between the imposition and the ultimate commutation of the sentence.  A sixth Justice concurs in a separate opinion based on the more limited ground that the imposition of a death sentence which experience shows will rarely, if ever,

---

[1] In *Commonwealth* v. *Tarver,* 369 Mass. 302, 319 (1975), in which five members of the court participated, the statement of the court on this subject was limited to the following:  "This court has decided that the death penalty for rape-murder is proscribed by our State Constitution. *Commonwealth* v. *O'Neal* [369 Mass. 242, 243 (1975)].  Accordingly the death penalty imposed herein must be vacated."

[2] One of those five Justices joins in the opinion of the court, but states in a separate concurring opinion his belief that the court should have declined to pass on the constitutionality of capital punishment in the instant proceeding.

be carried out, with the ensuing long delays before the ultimate commutation of the sentence, is per se "cruel and unusual and violates art. 26 of the Declaration of Rights."

In this situation, having full regard for the conclusions reached by this court in *Commonwealth* v. *O'Neal, supra,* I nevertheless must note that the decision was based on a standard of review shifting the burden of proof to the State which the court has chosen not to follow in today's decision. Similarly, and with full regard for the opinions expressed by five Justices of this court in *Opinions of the Justices, supra,* I note that they do not constitute a binding precedent. Therefore, I adhere to the views expressed (a) in the dissenting opinion by Justice Reardon, in which I joined in the case of *Commonwealth* v. *O'Neal, supra* at 283; (b) in my dissenting opinion in *Commonwealth* v. *Tarver, supra* at 320; and (c) in the opinions expressed by me jointly with Justice Braucher, in *Opinions of the Justices, supra* at 922. On the basis of those views which I have previously expressed, or in which I have previously joined, I respectfully disagree with the decision of this court that the current death penalty statute enacted by St. 1979, c. 488, and thereby incorporated into G. L. c. 279, §§ 52-56, is unconstitutional under art. 26 of the Declaration of Rights.

While the precise question which is before us is the constitutionality of a particular statute authorizing the imposition of the death penalty for murder in the first degree in prescribed circumstances, I believe the present decision constitutionally forecloses any legislative authorization of capital punishment for any crime in this Commonwealth. I believe that the court, by its decision in this case, has completely stripped the Legislature of the constitutional power which it has heretofore possessed and exercised for two hundred years to determine, in its wisdom and discretion, when and in what circumstances the public good requires the imposition of the death penalty for murder in the first degree.

We have thus reached the precise position which was presaged by the following language in *Commonwealth* v. *O'Neal,* 369 Mass. 242 (1975): "[I]f the present will of the

people of the Commonwealth is that capital punishment should be permitted in some or all cases of murder in the first degree, procedures for amendment of the State Constitution which are relatively speedy, but still require time for reasonable reflection, are available to accomplish that end." *Id.* at 275 (Hennessey, J. [now C.J.], concurring). The same quoted language was noted in *Opinions of the Justices, supra,* with the following reply thereto: "With respect, we would suggest that if the present will of the people is that capital punishment should *not* be permitted in some or all cases of murder in the first degree, procedures for amendment of the State Constitution which are relatively speedy, but still require time for reasonable reflection, are available to accomplish that end." *Id.* at 923 (joint opinion of Quirico and Braucher, JJ.). If the Legislature's existing power to determine what should be this Commonwealth's policy on the subject of capital punishment is to be abrogated, I believe that the latter statement suggests the correct approach to follow.

I do not, of course, question the authority or the duty of this court to pass on the constitutionality of the statute in question. *Paquette* v. *Fall River,* 338 Mass. 368, 376 (1959). Nor do I question the propriety of reaching the constitutional issue as presented in this case. I do, however, have serious reservations about the standards which the court has applied and the manner and extent to which I believe the court has intruded upon the province of the Legislature in arriving at its conclusion of unconstitutionality.

We start with the proposition that the Legislature has "full power and authority . . . to make, ordain, and establish, all manner of wholesome and reasonable orders, laws, statutes, and ordinances, . . . either with penalties or without, so as the same be not repugnant or contrary to this constitution, as they shall judge to be for the good and welfare of this Commonwealth, and for the government and ordering thereof, and of the subjects of the same . . . ." Part II, c. 1, § 1, art. 4, of the Massachusetts Constitution. In *Commonwealth* v. *Jackson,* 369 Mass. 904, 909 (1976),

this court said: "We note at the outset that the Legislature has great latitude to determine what conduct should be regarded as criminal and to prescribe penalties to vindicate the legitimate interests of society. . . . 'The function of the legislature is primary, its exercises fortified by presumptions of right and legality, and is not to be interfered with lightly, nor by any judicial conception of their wisdom or propriety.' *Weems* v. *United States*, 217 U.S. 349, 379 (1910). It is thus with restraint that we exercise our power of review to determine whether the punishment before us exceeds the constitutional limitations imposed by the Eighth Amendment and by art. 26" (citations omitted).

In determining the constitutionality of a statute, this court ordinarily assumes that the Legislature has acted on the basis of facts which have a rational bearing on the subject matter of the legislation, and which support the validity of the statute. *Hall-Omar Baking Co.* v. *Commissioner of Labor & Indus.*, 344 Mass. 695, 700 (1962). If the Legislature could have found any conceivable facts which would form a rational basis for its legislation, the court assumes that such facts were found, and it has never required that the Legislature expressly state that it found them, or state what findings it made. As to the statute now under consideration, the Legislature voluntarily indulged in the heretofore unnecessary and somewhat unusual, but not improper, practice of making and declaring express findings which are contained in St. 1979, c. 488, § 1.

In *Commonwealth* v. *Leis*, 355 Mass. 189, 192 (1969), it was argued that a statute was unconstitutional as "'irrational and unreasonable' because the Legislature did not thoroughly investigate the available scientific and medical evidence concerning marihuana when enacting and revising the law." This court rejected the argument, stating: "We know nothing that *compels* the Legislature to thoroughly investigate the available scientific and medical evidence when enacting a law. The test of whether an act of the Legislature is rational and reasonable is not whether the records of the Legislature contain a sufficient basis of fact to

sustain that act. The Legislature is presumed to have acted rationally and reasonably. See *Commonwealth* v. *Finnigan*, 326 Mass. 378, 379 [1950]; *Coffee-Rich, Inc.* v. *Commissioner of Pub. Health*, 348 Mass. 414, 422 [1965]. 'Unless the act of the Legislature cannot be supported upon any rational basis of fact that reasonably can be conceived to sustain it, the court has no power to strike it down as violative of the Constitution.' *Sperry & Hutchinson Co.* v. *Director of the Div. on the Necessaries of Life*, 307 Mass. 408, 418 [1940]."

In my opinion, it cannot be said that the statute under consideration "cannot be supported upon any rational basis of fact that reasonably can be conceived to sustain it." It should therefore follow, under that rule, that "the court has no power to strike it down as violative of the Constitution." I believe that the same result would follow if we were limited in our decision to a consideration of those facts expressly found by the Legislature.

It should surprise no one that the factual conclusions reached by the Legislature are not universally accepted. The Legislature's powers are not limited to action in areas where there is unanimity of opinion as to the need for action and the nature of the action required. There are few subjects which have been so widely debated for so long as has been the case with capital punishment. There are perhaps few subjects on which opinions are so polarized, and the basis for which is found in personal viewpoints without satisfactory factual proof to support them. We thus have a typical case for the application of the rule that "[w]here the reasonableness of the legislative finding or the factual basis of the legislative finding is fairly debatable the legislative determination must be sustained. . . . [And the fact that] there may be an earnest conflict of serious opinion does not suffice to bring matters of legislative judgment within the range of judicial cognizance." *Commonwealth* v. *Leis, supra* at 201 (Kirk, J., concurring).

Rather than applying the traditional standard of review, the court today attempts to determine whether the death

penalty is "unacceptable under contemporary moral stand-
ards."[3] However persuasive the argument might be if ad-
dressed to the Legislature, the analysis is, essentially, a
moral rather than a legal one. In thus elaborating its view
of contemporary morality, the court proceeds with no ap-
parent regard for the constitutionally distinct roles of the
judiciary and the Legislature.

If this court is to determine the constitutionality of the
death penalty in light of contemporary moral standards, I
believe it must, at a minimum, award great deference to the
legislative judgment implicit in the passage of the statute
that contemporary moral standards support the punishment
in certain circumstances. The fact that we interpret art. 26
rather than another provision of our Constitution should not
affect the functions and responsibilities of the coequal

---

[3] The opinion of the court does not reach the issue whether the death
penalty is a deterrent to crime. In its note 2, *supra*, however, citing *Opin-
ions of the Justices*, 372 Mass. 912 (1977), the court implicitly accepts the
standard of review set forth in that opinion, placing on the State the
burden of proving that capital punishment contributes more to the
achievement of a legitimate State purpose, such as deterrence, than does
life imprisonment. To the extent, if any, that the court suggests that the
Commonwealth bears a special burden of proving the superior deterrence
of the death penalty to the court in a judicial proceeding, I respectfully
disagree. That is a factual issue to be decided by the Legislature, and in
my opinion it is sufficient that there is some reasonable body of fact or
opinion which permits a finding of such value by the Legislature. What
matters is that there be a sufficient foundation for the Legislature's judg-
ment, and if there is, that judgment is not reviewable by a court. It is the
Legislature and not the court which must be satisfied or convinced about
the merits of the remedy or penalty which the former chooses to impose
for a particular offense. "Judicial inquiry does not concern itself with the
accuracy of the legislative finding, but only with the question whether it
*so lacks any reasonable basis as to be arbitrary. Standard Oil Co. v.
Marysville*, 279 U.S. 582, 586-587 [1929]." *Commonwealth v. Leis*, 355
Mass. 189, 201 (1969) (Kirk, J., concurring). See also *Gregg v. Georgia*,
428 U.S. 153 (1976), where a plurality of the United States Supreme
Court noted that the results of statistical attempts to evaluate the worth of
the death penalty "simply have been inconclusive." *Id.* at 185. "The
value of capital punishment as a deterrent of crime is a complex factual
issue the resolution of which properly rests with the legislatures." *Id.* at
186.

branches of government so as to justify an otherwise unwarranted and improper intrusion by the judiciary into the legislative domain. "'Judicial inquiry does not extend to the expediency, wisdom or necessity of the legislative judgment for that is a function that rests entirely with the lawmaking department.' *Slome* v. *Chief of Police of Fitchburg*, 304 Mass. 187, 189 [1939]." *Commonwealth* v. *Leis, supra* (Kirk, J., concurring). By substituting its view of contemporary standards for the view implicitly expressed by the Legislature, the court infringes on the Legislature's prerogative to define crimes and establish the terms of punishment. See *Commonwealth* v. *Jackson*, 369 Mass. 904, 909 (1976). Especially in an area of emotionally charged debate, our role should be limited to determining whether the Legislature's action exceeds its constitutional grant of power. In contrast, today's decision in effect limits the Constitution's grant of power to the Legislature to judge what shall be "for the good and welfare of this Commonwealth." I believe that we should not so alter the principles of judicial restraint and the constitutional requirement of separation of powers under art. 30 of the Declaration of Rights of the Constitution of the Commonwealth according to the nature of the subject matter of the legislation being construed.

This court's obligation "to avoid judicial legislation," *Commonwealth* v. *Isenstadt*, 318 Mass. 543, 548 (1945), should be particularly evident here, since in St. 1979, c. 488, § 1, the Legislature has articulated its judgment as to the deterrent and retributive value of capital punishment. Cf. *Roberts* v. *Louisiana*, 428 U.S. 325, 355 (1976) (White, J., dissenting) ("[Legislative judgments as to the efficacy of capital punishment] are solemn judgments, reasonably based, that imposition of the death penalty will save the lives of innocent persons. This concern for life and human values and the sincere efforts of the States to pursue them are matters of the greatest moment with which the judiciary should be most reluctant to interfere").

It is, of course, well established that art. 26 of the Declaration of Rights places a restraint upon the exercise of legislative power and an obligation on the court to judge the constitutionality of legislative determinations regarding punishment. It is also clear that art. 26 would bar certain punishments even if legislatively approved. See, e.g., *Commonwealth* v. *Moore*, 359 Mass. 509, 515 (1971). However, I am of the view that "for purposes of this analysis art. 26 of the Massachusetts Declaration of Rights imposes a standard no more restrictive than that expressed in the prohibition of 'cruel and unusual' punishment in the Eighth Amendment." *Opinions of the Justices*, 372 Mass. 912, 922 (1977) (Quirico, J., dissenting), quoting from *Commonwealth* v. *O'Neal, supra* at 294-295 (Reardon, J., dissenting). I do not believe that the court places any particular reliance on the slight difference between the words making reference to "cruel *or* unusual" punishment in art. 26 of the Declaration of Rights, and the words making reference to "cruel *and* unusual" punishment in the Eighth Amendment to the United States Constitution in interpreting art. 26 as proscribing the death penalty (emphasis supplied). We are, of course, free to interpret our own Constitution differently from the manner in which the United States Supreme Court interprets basically the same language in the United States Constitution. However, the total absence of any sound reason for the difference in interpretation gives cause to question the decision in this case. There is no historical reason to suppose that these words, first adopted as a part of the Massachusetts Constitution in 1780 and then adopted as part of the First through Tenth Amendments to the United States Constitution in 1790, were intended to have different meanings in substantially similar societal settings, both of which clearly recognized and sanctioned capital punishment for certain crimes. There is no other apparent reason why the nearly identical State and Federal constitutional provisions should not dictate identical results. See *Commonwealth* v. *O'Neal, supra* at 284, 293-294 (Reardon, J., dissenting), and cases cited. See also *Storti* v. *Com-*

*monwealth*, 178 Mass. 549, 553 (1901) (Holmes, C.J.) (dicta) ("[I]t is unnecessary to go into any nice argument upon the words of the article, and to decide whether, inasmuch as those words are 'cruel or unusual,' not 'cruel and unusual,' a punishment which is unusual but is not cruel is forbidden by them. . . . [T]he word 'unusual' must be construed with the word 'cruel' and cannot be taken so broadly as to prohibit every humane improvement not previously known in Massachusetts"). Cf. *Pugliese* v. *Commonwealth*, 335 Mass. 471, 474-475 (1957) (The rights under art. 12 of the Declaration of Rights of the Massachusetts Constitution are substantially the same as those secured under the Fourteenth Amendment to the Constitution of the United States).

I note that in seven separate instances the majority today relies in its decision on the concurring opinion of Mr. Justice Brennan in *Furman* v. *Georgia*, 408 U.S. 238 (1972), to the effect that the imposition and carrying out of the death penalty violates the Eighth Amendment to the United States Constitution. I believe it is appropriate to note in response that, interpreting the Eighth Amendment in light of evolving standards of decency, seven of the Justices of the United States Supreme Court have concurred in the view that the death penalty does not, of itself and in all circumstances, constitute cruel and unusual punishment: "It is now settled that the death penalty is not invariably cruel and unusual punishment within the meaning of the Eighth Amendment; it is not inherently barbaric or an unacceptable mode of punishment for crime; neither is it always disproportionate to the crime for which it is imposed." *Coker* v. *Georgia*, 433 U.S. 584, 591 (1977) (plurality). See *Gregg* v. *Georgia*, 428 U.S. 153, 168-187, 226-227 (1976); *Proffitt* v. *Florida*, 428 U.S. 242, 247, 260-261 (1976); *Jurek* v. *Texas*, 428 U.S. 262, 268, 277-279 (1976); *Woodson* v. *North Carolina*, 428 U.S. 280, 285, 306-324 (1976); *Roberts* v. *Louisiana*, 428 U.S. 325, 331, 350-356, 363 (1976).

Moreover, in following the evolving standards approach, the Supreme Court explicitly rejected the argument that

"the evolutionary process had come to an end, and that standards of decency required that the Eighth Amendment be construed finally as prohibiting capital punishment for any crime regardless of its depravity and impact on society." Instead the Court concluded that "it is now evident that a large proportion of American society continues to regard [capital punishment] as an appropriate and necessary criminal sanction." *Gregg* v. *Georgia*, 428 U.S. 153, 179 (1976) (plurality).[4] See J. H. Ely, Democracy and Distrust: A Theory of Judicial Review 65 (1980): "In their separate concurring opinions in *Furman v. Georgia* (1972), Justices Brennan and Marshall argued quite directly that the death penalty was unconstitutional because it was out of accord with contemporary community values. The risk in such a claim is obvious, and in this case it was tragically realized. Following *Furman* there was a virtual stampede of state reenactments of the death penalty, and the clarity of that community reaction surely had much to do with the Court's turnaround on the issue" (footnotes omitted).[5]

Thus, in its Eighth Amendment analysis the Supreme Court recognizes that "Eighth Amendment judgments should not be, or appear to be, merely the subjective views of individual Justices; judgment should be informed by objective factors to the maximum possible extent." *Coker* v. *Georgia*, 433 U.S. 584, 592 (1977) (plurality).[6] Indeed,

---

[4] The Court found that the legislative response to *Furman* v. *Georgia, supra,* was the most marked indication of society's endorsement of the death penalty, noting that after *Furman* at least thirty-five Legislatures enacted new statutes that provided for the death penalty. Also, the Congress of the United States enacted a statute providing for the death penalty for aircraft piracy that results in death. *Gregg* v. *Georgia*, 428 U.S. 153, 179-180 (1976).

[5] For a persuasive analysis of the problems inherent in a constitutional jurisprudence which seeks to measure the merits of policy judgments against a perceived set of "fundamental" values, see Ely at 43-72.

[6] In determining the constitutionality of a particular statute, the Court stated that it should give attention to public attitudes concerning a particular sentence — history and precedent, legislative attitudes, and the response of juries reflected in their sentencing attitudes. *Id.*

while recognizing that the "cruel and unusual" clause of the Eighth Amendment was intended to safeguard individuals from the abuse of legislative power, the Court has noted "the limited role to be played by the courts" in addressing an Eighth Amendment claim: "[I]n assessing a punishment selected by a democratically elected legislature against the constitutional measure, we presume its validity. We may not require the legislature to select the least severe penalty possible so long as the penalty selected is not cruelly inhumane or disproportionate to the crime involved. And a heavy burden rests on those who would attack the judgment of the representatives of the people. This is true in part because the constitutional test is intertwined with an assessment of contemporary standards and the legislative judgment weighs heavily in ascertaining such standards." *Gregg v. Georgia, supra* at 175 (plurality) (upholding the constitutionality of Georgia's statutory scheme for imposing death penalty).

Furthermore, a review of the various decisions of the United States Supreme Court on the constitutionality of the death penalty under the Eighth Amendment demonstrates clearly that a majority of the Justices emphasize the necessity for judicial restraint and deference to legislative judgments regarding capital punishment when analyzing a particular statute in light of evolving standards of decency. See *Gregg v. Georgia, supra* at 174-187 (plurality opinion by Stewart, J., with Powell and Stevens, JJ.); *Roberts v. Louisiana, supra* at 350-356 (White, J., dissenting); *Furman v. Georgia,* 408 U.S. 238, 383-384 (1972) (Burger, C.J., dissenting); *id.* at 410-411 (Blackmun, J., dissenting); *id.* at 428-433, 451-456 (Powell, J., dissenting). Cf. *Furman v. Georgia, supra* at 465-470 (Rehnquist, J., dissenting). As Mr. Chief Justice Burger stated in his dissent to *Furman v. Georgia, supra* at 383, "in a democratic society legislatures, not courts, are constituted to respond to the will and consequently the moral values of the people."

In part two of its decision the court properly suggests that c. 488 would meet Federal constitutional requirements.

Nevertheless, the court concludes that c. 488 — or any other statute providing for capital punishment — is unconstitutional under the Massachusetts Constitution. Part two of the decision holds the death penalty to be unconstitutional because it is arbitrarily inflicted, and because it falls discriminatorily upon minorities. To support this holding, the court takes judicial notice of the existence of racial prejudice in some persons in this Commonwealth. Even recognizing the existence of such prejudice, however, I am not prepared to accept a statistical showing from Florida, Georgia, Texas and Ohio as evidence of the extent of such discrimination in Massachusetts. There are no comparable statistics or other evidence before the court which suggests that the death penalty has been discriminatorily imposed in this Commonwealth. In the absence of such a record, I do not concede that sentencing under c. 488 would inevitably be arbitrary and discriminatory. To the extent that the court bases its opinion in part two on statistics from four other jurisdictions and an assumption about prejudice in Massachusetts, I believe that the court ignores traditional standards of review, and particularly review under G.L. c. 278, § 33E, much as it did in part one by its purported determination of contemporary moral standards.[7]

I note that for the first time to my knowledge this court, or some of the Justices of this court, are holding that the death penalty is "cruel or unusual" based in whole or in part on the fact that the imposition of the penalty is almost always followed by a long period of mental suffering by the convicted felon who is under the sentence of death, only to have the sentence commuted after many years of appellate

---

[7] General Laws c. 278, § 33E, as amended through St. 1979, c. 346, § 2, states in relevant part: "In a capital case as hereinafter defined the entry in the supreme judicial court shall transfer to that court the whole case for its consideration of the law and the evidence. Upon such consideration the court may, if satisfied that the verdict was against the law or the weight of the evidence, or because of newly discovered evidence, or for any other reason that justice may require (a) order a new trial or (b) direct the entry of a verdict of a lesser degree of guilt, and remand the case to the superior court for the imposition of sentence."

procedures. I find it difficult to understand or appreciate how it is constitutionally cruel or unusual punishment to permit a person who has been sentenced to death to pursue appellate procedures almost *ad infinitum* when, as stated by the Justices taking that position, the procedures always end in a commutation of the death sentence. To the extent that a defendant resorts to those endless appellate procedures, he should not be heard to complain about the prolongation of his period of anxiety and agony over his possible execution. To the extent that the delays are due to the actions of intermeddlers, the court is not without power to deal with them. As to ultimate commutations by executive officers, the courts are not responsible for such action. In any event, if this is to be a ground for the holding, I question the fairness of buttressing that holding by quotations from the unverified "brief" submitted by Henry Arsenault. If his description of his ordeal while under sentence of death is accurate, it would be appropriate for submission to the Legislature for its consideration of the "expediency, wisdom or necessity" for capital punishment, but that is not what we are asked to decide in this case. If that description were before the Legislature, it would be open to and appropriate for the Legislature to consider also the description by this court in *Commonwealth* v. *Devlin* (and *Arsenault*), 335 Mass. 555, 559-563 (1957), of the deliberate planning, preparation which included the purchase of firearms, and execution by Arsenault and his codefendants of the invasion of a house while the occupants were present, the attempted commission of a robbery while armed, the resulting terrorization of the occupants, and the cruel and senseless murder of one of them. The place to present all of that information is before the Legislature for its consideration of the policy to be adopted on the subject of capital punishment, and not before this court. I believe that this is an appropriate occasion to recall that "legislatures are ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts." *Maher* v. *Roe*, 432 U.S.

464, 479-480 (1977), quoting from *Missouri, K. & T.R. Co.* v. *May,* 194 U.S. 267, 270 (1904) (Holmes, J.).

In summary, the issue before the Justices of this court, as I see it, is not whether any Justice favors or opposes capital punishment as a matter of Commonwealth policy. Nor is the issue whether any Justice would favor or oppose capital punishment if he were called to vote thereon as a member of the general public or as a member of the Legislature. Rather, the issue before us, as I see it, is whether the Legislature has the power, under the Constitution of the Commonwealth, to enact a statute mandating capital punishment for certain types of murder in the first degree, and more specifically whether it has the power to enact St. 1979, c. 488, the statute under consideration, which authorizes the imposition of the death penalty for murder in the first degree committed in particular, specified circumstances. A vote on the subject of capital punishment by a member of the general public or by a member of the Legislature requires a consideration of broad questions of public policy. A vote on the same subject as it comes before the court in this case involves consideration of the much more limited constitutional question of the power of the Legislature to determine what the public policy of the Commonwealth should be on this subject. I conclude that the Legislature has the power to make that decision under the provisions of the Constitution of this Commonwealth, and I reach that conclusion without regard to any personal views which I may have on the "expediency, wisdom or necessity" of capital punishment.